**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COUNTY OF DELAWARE | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No.:  2:19-cv-02430-JMY |
| | : |
| TRAVELERS PROPERTY CASUALTY | : |
| COMPANY OF AMERICA, | : |
| | : |
| Defendant. | : |

**DEFENDANT'S BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Travelers Property Casualty Company of America ("Travelers"), by and through its undersigned counsel, hereby submits this Brief in support of its Motion for Summary Judgment. As set forth more fully herein, there are no disputed material issues of fact with regard to any of Plaintiff's purported claims. Travelers is entitled to, and respectfully requests, summary judgment in its favor with respect to all claims asserted by Plaintiff, County of Delaware, in its Complaint.

**I.     INTRODUCTION**

In August of 2013, Plaintiff discovered a concrete spandrel beam on the top floor of a municipal parking garage (the "Garage") that was about to break loose and fall three stories to the ground.   Fortunately, Plaintiff discovered the failing beam and removed it in time to prevent any injury.   At that time, Plaintiff undertook an engineering evaluation of the Garage, which established that the Garage was in serious disrepair and that further failures were likely unless significant funds were committed to rehabilitate the failing structure.   Rather than invest the time and money necessary to refurbish the old Garage, Plaintiff decided that it was more cost effective to demolish

and replace it.  Five years later, while the garage was still awaiting demolition, a similar panel fell from the roof of the Garage onto the top level of the parking deck, causing limited damage.  Plaintiff hopes to use this Incident as an excuse to charge the costs of the garage replacement to Travelers.

Plaintiff seeks coverage under an insurance policy (the "Policy") issued by Travelers for damage sustained on July 27, 2018 when the pre-cast concrete panel fell and caused limited damage to the area directly below (the "Incident").  The undisputed evidence establishes that the panel fell because of corroded, deteriorated and rusted welded steel connections, a condition well known to Plaintiff especially when the 2013 event was caused by failed steel connections.  In fact, exactly four months before the panel fell, an engineer specifically warned Plaintiff that its failure to correct the numerous structural deficiencies noted in the five years since the 2013 event had left the Garage in such a dilapidated state that it needed to be shuttered, and immediate funding was needed to ensure the safety of the structure.  Plaintiff chose to do nothing in response.   Both Joseph Barbato, the engineer who prepared structural assessment reports for the Garage before the incident, and Steven Burke, Plaintiff's construction expert, both testified that the panel fell because of the same deteriorated conditions known to exist in the Garage before the incident.

The contractual terms of the Policy bar coverage for Plaintiff's damages.  First, the Policy excludes losses due to deterioration, rust or corrosion as well as collapse. Plaintiff contends that the Incident falls within a limited exception to the collapse exclusion known as the Abrupt Collapse Additional Coverage, in particular for "building decay that is hidden from view, unless the presence of such decay is known to an

2

insured prior to collapse".  Plaintiff has the burden of proof to meet this exception. Courts in the Eastern District have reviewed this policy language and held it to be inapplicable under similar facts.  As discussed below, Plaintiff cannot meet its burden to establish the prerequisites for this coverage as the evidence establishes without question that Plaintiff had knowledge of the problems with the steel connections throughout the Garage for many years prior to the incident, and received warnings of what would happen if the deficiencies throughout the Garage were not corrected.

While the fallen panel only caused localized damage to the Garage, Plaintiff also seeks to stick Travelers with the price tag to completely demolish and rebuild the Garage along with two adjacent buildings, estimated by Plaintiff to be in excess of $32 million.  As there is no competent evidence of damage outside of impact area, even if Plaintiff could establish a right to the Abrupt Collapse Additional Coverage (which it cannot), it cannot prove a right to be reimbursed for the complete replacement of the Garage and the neighboring buildings.

Given the absence of coverage, Plaintiff's bad faith claims fail as a matter of law. Travelers' reasonable basis to deny this claim was further justified when it was discovered that Plaintiff had chosen to withhold certain documents regarding pre-existing issues, the same types of issues that caused the panel to fall, in response to Travelers' reasonable requests during the investigation of the underlying loss.   As such, Plaintiff's claim for payment under the Policy and its bad faith claims are without basis and summary judgment in favor of Travelers is therefore appropriate.

## II.    FACTUAL SUMMARY

Travelers filed an Undisputed Statement of Facts supported by the evidence with its Motion for Summary Judgment, which are incorporated herein by reference.

## III.    PROCEDURAL HISTORY

On May 1, 2019, Plaintiff, the County of Delaware, commenced this action by filing a Complaint in the Court of Common Pleas of Delaware County, Pennsylvania. In its Complaint, Plaintiff asserts various causes of action against Travelers relating to the subject incident.  ECF #1, Attachment #1; Exhibit A, Complaint.  Count I of Plaintiff's Complaint seeks declaratory relief and Count II alleges a breach of contract claim based on Travelers' denial of the insurance claim, and seeks all damages that Plaintiff contends relates to the Incident.  *See id.*  In Count III, Plaintiff asserts a count for statutory bad faith under 42 Pa.C.S.A. § 8371, and breach of the implied covenant of good faith and fair dealing in Count IV.  On June 4, 2019, Travelers removed Plaintiff's action from the Court of Common Pleas of Delaware County, Pennsylvania to the United States District Court for the Eastern District of Pennsylvania. ECF #1 – Notice of Removal.  Pursuant to the Court's Scheduling Order, Travelers brings this Motion for Summary Judgment.

## IV.    STATEMENT OF QUESTIONS INVOLVED

**A.** Whether Count I (Declaratory Judgment) and Count II (Breach of Contract) of Plaintiff's Complaint fail as a matter of law because the Policy does not provide coverage for Plaintiff's Claims?

Suggested Answer: Yes.

**B.** Whether Count III (Statutory Bad Faith) and Count IV (Breach of Implied Covenant of Good Faith and Fair Dealing) fail as a matter of law because the undisputed facts show that Travelers acted fairly and in good faith had a reasonable basis for its denial of coverage?

Suggested Answer: Yes.

4

## V.    ARGUMENT

### A.    Legal Standard For Summary Judgment

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Melrose Inc. v. City of Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010).  A party seeking summary judgment bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex,* 477 U.S. at 322.  When the record taken as a whole could not lead to a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial, and the entry of summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986).

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."  *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* at 248.

**B.     Policy Interpretation Is A Question of Law For the Court To Decide**

Under Pennsylvania law, the interpretation of an insurance contract is a matter of law for the court. *Lexington Ins. Co. v. Western Penn. Hosp.*, 423 F.3d 318, 323 (3rd Cir. 2005); *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union, Ins. Co.*, 908 A.2d 888, 897 (Pa. 2005) (stating that the interpretation of an insurance policy is a question of law).  Courts are required to give effect to all language of the insurance policy where possible. *Western Penn. Hosp.*, 423 F.3d at 326.  A court may dispose of cases on summary judgment where the sole issue concerns the interpretation of the policy. *Nationwide Mut. Ins. Co. v. Garzone*, 2009 WL 2996468, at *10 (E.D. Pa. Sept. 17, 2009); *Harleysville Ins. Co. v. Aetna Casualty & Surety Ins. Co.*, 795 A.2d 383, 385 (Pa. 2002), (holding that "interpretation of an insurance policy is a question of law that a court may resolve on motion for summary judgment").

A court's primary task when interpreting an insurance policy is to ascertain the parties' intentions as manifested by the policy's terms.  *Kvaerner,* 908 A.2d at 897. When the plain language of the policy and its terms are clear and unambiguous, a court must enforce the policy as written. *Standard Venetian Blind Co., V. Am. Empire Ins. Co*, 469 A. 2d 563, 566 (1983). In this diversity action, Pennsylvania law applies in construing the language of the insurance policy.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 81 (1938). In determining whether Defendant breached its contract, the Court must interpret the terms of the insurance policy. *Madison Const. Co. v. Harleysville Mut. Ins.* Co., 735 A.2d 100, 106 (Pa. 1999).  Words of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense. *Id.*

**C.    Travelers Is Entitled To Judgment In Its Favor As To Plaintiff's Claims For Declaratory Relief In Count I And Breach Of Contract In Count II**

A party asserting a breach of contract claim under Pennsylvania law must demonstrate (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) resulting damages. *Smith v. Allstate Ins. Co.*, 904 F.Supp.2d 515 (W.D. Pa. 2012).

**1.    The Damage To The Garage Is Within The Policy's Exclusions For "Rust, Or Other Corrosion" And Deterioration**

The Policy at **SECTION C.2. EXCLUSIONS** contains exclusions for "rust or other corrosion" and deterioration.   *See* Travelers Statement of Facts at ¶ 63.   These exclusions are unambiguous.  In *Cyclops Corp. v. Home Ins. Co.*, 352 F Supp. 931, 936 (W.D. Pa 1973), the court consulted dictionary definitions of the terms "corrosion" and "deterioration."   By looking at dictionary definitions, the court noted the terms "deterioration" and "corrosion" have been defined as "the action of normally expected elements of stress, friction, and the daily traumas of its life to the object during its normal life expectancy."   *Id.* at 936.

In *Steven J. Inc. v. Landmark Am. Ins. Co.*, 2015 WL 3849166, at *8 (M.D. Pa. June 22, 2015), the court found that the wear and tear and deterioration exclusions applied to damage to a building from a roof that had outlived its service life, and showed age-related deterioration.  Similarly, in *Hamm v. Allstate Prop. & Cas. Ins. Co.*, 908 F. Supp.2d 656 (W.D. Pa. 2012), the insured sought coverage under his policy after he noticed bulging of the stone veneer wall in the rear of his home. The insurer denied the claim relying on several exclusions in the insurance policy including wear and tear and deterioration. The insurer subsequently retained an engineer who opined that the loss

7

resulted from wear and tear and deterioration.  The court held that the undisputed evidence established that the loss resulted from deterioration, and therefore, the loss was excluded under the insurance policy.  *See also Mcmahon v. State Farm Fire Ins. Co.*, 2007 WL 1377670, at *4-6 (E.D. Pa. May 8, 2007) (granting insurer's summary judgment motion because the exclusion for losses to the residence which are caused by "wear, tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown" barred coverage).

Further, the Policy excludes losses caused by "rust, or other corrosion".  By its plain and ordinary terms, rust is defined as "a reddish-or yellowish-brown flaking coating of iron oxide that is formed on iron or steel by oxidation, especially in the presence of moisture" and "a state of deterioration or disrepair resulting from neglect or lack of use." *See* Oxford English Dictionary, 2017. Corrosion is defined as destroy or damage (of metal or other materials) slowly by chemical action; destroy or weaken (something) gradually.  *See* Oxford English Dictionary, 2017.

There is no dispute that the Incident was caused by deterioration, corrosion and rusting of the steel welds that connected the panel to the wall.  In his June 12, 2020 expert report, Mr. Greve opined, "the weld quality is poor, and the top welds are deficient. Over the years, the welds have rusted and deteriorated."  Mr. Greve further opined "the heavy concrete roof panel that fell became dislodged from its support frame because the welds were deficient when originally installed and also experienced long-term fatigue cracking and corrosion.  The 11-ton precast roof panel was ready to fall at any time due to long-term deterioration".  *See* Ex. I at Ex. 5 thereto, pp. 1, 3, and 6.  Mr. Urban, Plaintiff's proffered engineering expert, states in his November 5, 2018 report,

the lower welds "exhibited signs of rusting" and the top weld was "deteriorating".   *See* Ex. J at Ex. 3 thereto, PVE's November 5, 2018 report at p. 2.   In reports prepared in 2013, 2014 and 2018, Mr. Barbato of JBA advised Plaintiff that there were many deficiencies in the Garage, including "deteriorated steel connections" and "deteriorated steel – corroding".   *See* Travelers Statement of Facts at ¶¶ 8-15, 23-27, and 31.

The Policy excludes losses caused by rust or corrosion and deterioration, and the falling of the panel from these conditions is barred from coverage.

### 2.     The Claimed Damages To The Garage Are Also Barred By The Collapse Exclusion And No Exception Applies

Plaintiff argues that the loss falls within the Abrupt Collapse Additional Coverage.  The Policy specifically excludes damage caused by "collapse" defined as (a) an abrupt falling down or caving in; (b) loss of structural integrity, including separation of portions of the property or property in danger of falling down or caving in; or (c) any cracking, bulging, sagging, bending, leaning, settling, shrinking or expansion as it relates to Paragraphs (a) or (b).   *See* Travelers Statement of Facts at ¶ 61.   The Incident falls within the clear terms of the collapse exclusion.  As relates to the dispute at issue, the Policy provides a limited exception to the collapse exclusion for an "abrupt collapse to the extent that coverage is provided under the Abrupt Collapse Additional Coverage in **(3)** below".   *See id.*   The Abrupt Collapse Additional Coverage states in relevant:

**(3)**   Abrupt Collapse Additional Coverage

The term Covered Cause of Loss includes abrupt collapse as described and limited under Paragraphs **(a)** through **(g)** below.

**(a)**     As used in this Additional Coverage, abrupt collapse means abrupt falling down or caving in of a building or any portion of a building

9

with the result that the building or portion of the building cannot be occupied for its intended purpose.

**(b)**     We will pay for direct physical loss of or damage to Covered Property, caused by abrupt collapse of a building or any portion of a building that is insured under this Coverage Form, or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

      **(i)**     Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

           *            *            *

*See id.* at ¶ 62.

In order to trigger the additional coverage for abrupt collapse, the collapse must be caused by one or more of the specific enumerated causes. *See S.R.P. Mgt. Corp. v. Seneca Ins. Co.,* CVA. 06-935, 2008 WL 2039466 (E.D. Pa. May 13, 2008) (Strawbridge, J.).   Plaintiff bears the burden of proving that an exception to the exclusion is applicable, such that the damages claimed are covered notwithstanding the collapse exclusion.  *Id.* at *7.  (citing *TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 915 (Pa. Commw. 2004); *Northern Ins. Co. v. Aardvark Assocs.*, 942 F.2d 189, 194 (3d Cir. 1991)).

Plaintiff asserts that loss falls within the exception for abrupt collapse caused by "building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse."[1]  As the conditions that led to the collapse were neither hidden nor unknown to Plaintiff, its attempt to establish coverage under this provision must fail as Plaintiff cannot meet its burden of proof at the summary judgment stage.

---

[1]  While not addressed in detail herein, Travelers does not concede that the rust, corrosion, and deterioration of the welds constitutes "decay".

### a. The Incident Was Not Caused By Building Decay That Was Hidden From View

The term "hidden" may be defined by its natural plain and ordinary sense, which may be informed by dictionary definitions.  *S.R.P. Mgmt. Corp.*, 2008 WL 2039466, at \*7 (citing *Wurst v. State Farm Fire & Cas. Co.*, 431 F.Supp.2d 501, 505 n. 7 (D.N.J.2006)). The term "hidden" is not ambiguous, and in ordinary usage something is considered hidden if it is "out of sight."  5 New Appleman on Insurance Law Library Edition § 45.06, p. 10.  The Eastern District in *S.R.P. Mgmt. Corp.*, defined the term "hidden decay" to mean decay that is "not visible," "out of sight," or "concealed".  2008 WL 2039466, at \*7 (internal citations omitted).  The insured bears the burden of proof to show that the alleged decay was out of sight and not visible.  *Id.*

Here, the evidence indicates the failure started in the top weld connection to the panel.   The top welds were "visible" and not "out of sight".   Plaintiff's proffered engineering expert Jeremy Urban testified that one could see the top welds by climbing up a ladder and using a mirror or camera to see the welds.  *See* Ex. J, Dep. of J. Urban at p. 170, lns. 18-24. Travelers' engineering expert, Mr. Greve testified similarly. Ex. I, Dep. of H. Greve at p. 107, lns. 16-18. The top welds were visible and could have been inspected.   Therefore, because the welds were visible, the condition that led to the collapse of the panel was not "hidden" within the meaning of the Policy.

In analyzing the meaning of hidden decay, the insured simply cannot assert that it was unaware of the decay to meet its burden of proof.  *S.R.P. Mgt. Corp.*, 2008 WL 203466, at \*8.   "The test must have an objective element to it-that is to say that a reasonable insured under such circumstances would have seen or otherwise been aware of the decay. The applicable standard is that of the reasonable insured."  *Id.*

(citing *The Sandalwood Condominium Ass'n at Wildwood, Inc. v. Allstate Ins. Co.*, 294 F.Supp.2d 1315, 1319 (M.D.Fla.2003) ("[a]n insured must also take reasonable steps to correct damage before it undermines the structural integrity of the building.")). The insured cannot retreat to willful blindness or refusal to draw those conclusions a reasonable insured would draw from visible signs of deterioration or decay.  *Id.*  (citing *Judge v. State Farm Ins. Cos.*, No. Civ. A. 92-C-03-010, 1993 WL 1611307, *3 (Del.Super. May 3, 1993) ([i]It is reasonable to attach the responsibility of being aware of the conditions of one's home to those areas where the damage is clearly preventable through reasonable and routine maintenance or where the homeowner should be aware of the problem.").

The *S.R.P. Mgmt. Corp.* opinion continued, "[t]he presence, prior to the collapse, of visible evidence of the specific decay that caused the collapse or **the visible symptoms of such decay** will be sufficient to establish that the insured knew or reasonably should have known of the decay".  2008 WL 2039466, at *8 (emphasis added).  "This approach fosters the fundamental concept of insurance that it provides coverage for fortuitous events.  Collapse caused by visible decay is not fortuitous in that the cause of the risk is visible to the insured and the degree of risk is knowable." *Id.* Thus, in order for the additional coverage for collapse caused by hidden decay to apply, the insured must have neither actual nor constructive knowledge of the decay. *Id.* at *13 (citing *Andrew-Riverside Presbyterian Church v. Guide One Mut. Ins. Co.* 2005 WL 949183, at *4 (Minn. Ct. App. April 26, 2005) (holding that the decay of the plaintiff church's walls was not hidden where there the plaintiff had longstanding prior notice of the church's structural defects)).  Judge Strawbridge, in limiting the exception, reasoned

"in the absence of a reasonable insured objective test, the hidden decay exception could well swallow the "collapse" exclusion. The alternative, of course, is for the insured to obtain insurance that covers all forms of collapse." *S.R.P. Mgt. Corp.*, 2008 WL 203466, at *8.

As noted by the Court in *S.R.P. Mgmt. Corp.*, fortuity and hidden decay are related concepts. *Id.* Under Pennsylvania law as predicted by the United States Court of Appeals for the Third Circuit, there is an implied exclusion in every all-risk insurance policy for losses that are not fortuitous. *See PECO Energy Co. v. Boden*, 64 F.3d 852, 858 (3d Cir.1995) (citing *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 75–76 (3d Cir.1989). A fortuitous event ... is an event which so far as the parties to the contract are aware, is dependent on chance." *See PECO Energy Co.*, 64 F.3d at 858. Such an event "may be beyond the power of any human being to bring the event to pass; it may be within control of third persons, provided that the fact is unknown to the parties. The thrust of the definition is that the occurrence be unplanned and unintentional in nature." *Peters Twp. Sch. Dist. v. Hartford Acc. and Indem. Co.*, 833 F.2d 32, 37 (3d Cir.1987) (citing *Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am.*, 724 F.2d 369, 372 (3d Cir.1983)). Whether a claimed loss is fortuitous is a question of law for the court to determine. *Intermetal Mexicana*, 866 F.2d at 74 (citing *Compagnie des Bauxites*, 724 F.2d at 371–2).

In *S.R.P. Mgmt. Corp.,* the Eastern District of Pennsylvania determined the insured failed to meet its burden of proof to show that the decay was hidden. *Id.* at *13. Although the specific decayed area of the wooden truss could not be viewed prior to the Incident, the court concluded that areas around the truss including rotted roof decking

and the wooden purlins located directly above the collapsed end of the failed truss also showed severe rot that would have been visible prior to the collapse and that the deteriorated status of the roof and roof gutter in the area above the failed truss was readily visible.  *Id.* at *6.  The court concluded that a reasonable insured would have been aware of the decay due to the systemic decay of the areas around the decayed area of the wooden truss.  *Id.* at *13.

### b. There Is Ample Evidence That Plaintiff Was Aware Of The Presence Of The Problems With The Steel Connections Before the Incident

The subject provision goes further than the provision in *S.R.P. Mgmt. Corp.* that limited the exception to just "hidden decay", and states that the insured must not know of the presence of the decay prior to the collapse.  As noted above, Plaintiff bears the burden of proof on this issue.

In *Fry v. Phoenix Ins. Co.*, the Eastern District of Pennsylvania interpreted a similar provision that covered a collapse if it was caused by "[d]ecay that is hidden from view unless the presence of such decay is known to the insured prior to collapse or there are visible signs of water damage and the insured has not taken prompt action to prevent further damage."  54 F.Supp.3d 354, 356 (E.D. Pa. 2014).  The court in *Fry* held that under Pennsylvania law the collapse of a wall was not covered where the insureds were notified of problems with the wall and took no prompt action to prevent further damage. *Id.*  The court granted Phoenix's motion for summary judgment.

In *Fry*, the plaintiff/insureds had a history of problems with a section of the stone veneer facade ("wall") of their home.  In 2003, a bulge in the wall was observed.  *Id.* at 357.  The insureds engaged an engineer who opined that the wall did not have a

sufficient number of wall anchors and was at risk of collapse.  *Id.* at 357-8.  In 2011, the insureds made a claim for water damage that caused the wall to bulge.  *Id.* at 356. Investigation into this claim discovered that the cause was likely an insufficient number of wall anchors and deteriorated mortar joints.  *Id.* at 358-9.

A year later, the insureds made another claim when the wall collapsed.  *Id.* Similar to Plaintiff here, the insured had been provided engineering reports detailing the problems with the wall.  The claim was denied.

When the wall collapsed, it was discovered that there were no masonry anchors at all connecting the wall to the home.  The insured claimed that the additional coverage for abrupt collapse should apply as they were unaware of the "specific type of decay that caused the collapse" as the complete absence of anchors was unknown to them prior to the event.  *Id.* at 364.

The court rejected the insured's argument outright where prior engineering reports notified the insureds of the general conditions that led to the collapse.  Despite knowledge of these conditions, the insureds did nothing to fix or brace the wall before it fell down.  The court concluded that, in spite of their lack of knowledge of the complete absence of wall anchors, no jury could find that the insureds' response to the various engineering reports was objectively reasonable and granted summary judgment to the insurer on the claim for coverage for abrupt collapse. *Id.* at 365-6.

The *Fry* court also found that the loss was not fortuitous.  In particular, the court focused on the fact that although the insured did not know the exact cause of the collapse until after the wall fell down, the insureds were previously notified of a problem involving the wall anchors and that a collapse could occur if the wall was not braced

until repairs could be implemented.   "Nonetheless, they failed to follow the recommendations of the experts to dismantle and rebuild the wall, and they failed to brace the wall until it could be repaired."   *Id.* at 367.  Such an event is not a fortuitous loss.

Under the analysis set forth above, a reasonable insured/owner of the Garage would have been aware of the problems with the steel connections in the Garage dating back to 2013 when a roof level spandrel leaned forward due to a failure in the welded steel connections.  Specifically, on August 9, 2013, a rooftop spandrel beam was found to be leaning forward due to a failure in its steel weld connections.  *See* Travelers Statement of Facts at ¶ 5.

Since that time, JBA repeatedly warned Plaintiff that its failure to make structural repairs would allow the Garage to continue to deteriorate and become structurally unsafe.

- JBA's October 3, 2013 report warned Plaintiff of deficiencies including "broken welds, detached steel weld plates, deteriorated steel connections". Per the JBA report, "these conditions and deficiencies affected the structural integrity and stability of the garage and/or the safety of persons using the garage…. If left unattended, these conditions would continue to deteriorate affecting the structural integrity of the elements and posing a threat to the safety of the people using the garage".   *See id.* at ¶¶ 8-13.

- In a November 1, 2013 letter, JBA notified the County's Director of Public Works, "the condition of the garage is considered poor and in need of extensive repairs – both immediate and near future."   JBA warned of "many

deficiencies including broken welds, detached steel weld plates, deteriorated steel connections" and that the "the condition of the garage is considered poor and in need of extensive repairs – both immediate and near future." *See id.* at ¶¶14-17.

- The February 28, 2014 report noted deterioration throughout the Garage and recommended repairs.   JBA recommended that the phased repair work identified in its 2014 report be completed to "restore the garage to a safe and serviceable condition" and document deteriorated conditions therein.  *See id.* at ¶¶18-28.

Again, while Plaintiff sporadically corrected spalling of concrete, Plaintiff chose not to make any long-term repairs that would have extended the life of the Garage and kept it safe from this very type of event.  Rather, Plaintiff decided that it was better to allow the Garage to fall into disrepair and, eventually, replace it with a new structure. By March of 2018, four months before the subject incident, the conditions at the Garage had gotten so bad that JBA recommended shuttering the Garage and the funding be obtained to ensure the safety of the structure.  JBA reiterated the same deficiencies, including broken welds, detached steel weld slates, and deteriorated steel connections, that impacted the structural integrity, stability and safety of the Garage.   JBA also warned Plaintiff that the Garage has exceeded its useful design life.  Plaintiff, once again, chose to ignore the recommendations of its professionals.  *See id.* at ¶¶ 31-34.

It is expected that Plaintiff will argue that none of the reports specifically warned them of the need to replace the top welds of the failed panel. This is the same argument this District rejected in *Fry*.  In this case, the engineering reports detailed deteriorated

and broken steel and welded connections throughout the Garage. Similar to the insured in *Fry*, Plaintiff was previously put on notice of problems with deterioration and corrosion in all of the steel connections, among other deficiencies, and these deficiencies impacted the structural integrity, stability and safety of the Garage and that the Garage had outlived its useful design life. Plaintiff did not take any actions to remedy these deficiencies.  The objectively reasonable insured would have taken action to address these problems.  *See S.R.P. Mgt. Corp.*, 2008 WL 203466, at *8.  The Incident is not fortuitous as Plaintiff did not follow the recommendations of their engineer, JBA, to correct the deficiencies in the Garage before the incident.   Plaintiff's proffered construction pricing expert, Mr. Burke, testified that the Incident was symptomatic of the deteriorated conditions noticed in the 2016 programming report.   *See* Travelers' Statement of Facts at ¶ 52.  Per Mr. Barbato, the fallen spandrel was consistent with the same deteriorated conditions that he advised the Plaintiff about back in 2014.  *See id.* at ¶ 53.

In addition, the photos of the lower welds connections that connected the panel to the canopy showed evidence of deterioration, rusting and corrosion.  *See* photos 8 to 14 of H. Greve's August 5, 2018 report, Ex. H at Ex. 15 thereto.   A similar scenario was presented in *S.R.P. Mgmt. Corp.* where although the decayed area on the wooden truss was not visible, the material surrounding the decayed wooden truss was in such a state of disrepair that there was no reasonable conclusion other than that the insured in that case knew of the condition that caused the loss.  2008 WL 203466, at *6, 13.  Here, the failed welds were capable of being inspected.  Even if Plaintiff never visually inspected the top welds of the failed panel, the lower four welds showed obvious signs of rusting

and corrosion.  Indeed, there were deteriorated, corroded and rusted steel connections throughout the entire Garage that Plaintiff chose not to address before the Incident.

Based on the visible examples of the deteriorated steel connections and broken steel welds, the warnings by JBA in the years preceding the Incident, and the intentional decision of Plaintiff to not incur the cost to fix these conditions, Plaintiff cannot meet its burden of proof to show that the condition that caused the panel to fall was building decay hidden from view, the presence of which was unknown to Plaintiff.  Plaintiff's failure to address the known deficiencies amounts to a willful blindness to the state of the entire Garage, including the condition of the subject panel.  More importantly, Plaintiff cannot establish an entitlement to coverage under the Abrupt Collapse Additional Coverage.  Travelers submits that summary judgment should be entered in its favor as to Counts I and II.

**D.     The Policy Limits Coverage To Direct Physical Loss And Plaintiff Has Not Introduced Evidence To Show There Was Damage To The Garage Outside Of The Area Below The Fallen Panel**

Travelers submits in this Motion that Plaintiff is not entitled to any coverage for the Incident because the exclusions cited above bar coverage.  In the event that this Court finds an issue of fact as to coverage, Plaintiff cannot set forth a viable claim for coverage for the cost to demolish and rebuild the entire Garage, and the adjacent Toal and Sweney buildings.  The Policy states:

**A.     COVERAGE**

> We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.[2]

Plaintiff has not presented any evidence of damage to the Garage from the

---

[2] *See* Travelers' Statement of Facts at ¶¶ 59-60.

subject event outside of the impact area and the repairs detailed in the J.S. Held Repair Budget.[3]  Courts applying Pennsylvania law have defined "direct physical loss" under an insurance contract as a loss that results "immediately and proximately from an event." *Cher-D, Inc. v. Great Am. All. Ins. Co.*, No. CIV.A. 05-5936, 2009 WL 943530, at *6 (E.D. Pa. Apr. 7, 2009) (Surrick, J.).  Further, the term "resulting from" in an insurance contract has been interpreted as meaning proximate causation.  *Id.* at *6.  Plaintiff has the burden to prove that the Garage and the Sweney and Toal buildings were damaged by a direct physical loss.  Plaintiff also has the burden to show that the limited damage to the garage from the fallen panel requires the total replacement of the garage.  *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 232 (3d Cir. 2002) ("the plaintiffs have the burden to establish that their structures were, in fact, physically damaged in order to trigger coverage"); *Heller's Gas, Inc. v. Int'l Ins. Co. of Hannover Ltd.*, No. 4:15-CV-01350, 2017 WL 4119809, at *9 (M.D. Pa. Sept. 18, 2017) ("[i]n order to trigger coverage, Plaintiff has the burden of establishing that its covered property was damaged").  Plaintiff cannot meet this burden.

       1.     **Plaintiff Cannot Meet Its Burden Of Proof To Show Direct Physical Loss To The Garage Outside Of The Impact Area Resulting from the Incident And There Is No Genuine Dispute For Trial On This Issue.**

The panel knocked loose spalled concrete from the girders and precast double-tee beams located directly below the impact area.  The panel that fell was a non-structural component of the garage, attached to the canopy on top of the third floor

---

[3] *See* Travelers' Statement of Facts at ¶ 83.

deck.  See photos below from the Joseph Barbato July 30, 2018 report (see Travelers' Statement of Facts at ¶ 48), which shows the fallen panel:[4]



Photo 1: Collapsed high roof spandrel beam.

The panel punctured the floor of the parking deck below. See photo below which shows debris on the floor below.    However, beyond the impact area, there were no other signs of damage caused by the fallen panel.

---

[4] Photos 1 and 2 to H. Greve's 8/5/18 report provide an overview image of the location of the panel.  *See* Ex. H at Ex. 15 thereto at Photos No. 1 and 2.



There has been no evidence produced – and no evidence exists – that the fall caused damage to any other area of the Garage.

The engineers in this case agree that there was an identifiable area of impact from this Incident.  In his August 5, 2018 report, Mr. Greve observed that:

> [T]he large concrete roof panel fell onto the 3rd level parking deck causing impact damage to the concrete slab and the fall vibration knocked loose spalled concrete from the girders and precast double tee beams located directly below the impact area. There were no structural damages to the parking structure outside the direct impact fall area.

See Ex. H at Ex. 15 thereto, H. Greve's August 5, 2018 report at p. 1.

Mr. Greve opined similarly in his June 12, 2020 supplemental expert report, stating "There is no indication that vibration or impact energy from the panel fall caused damages to the lower level parking decks or the parking structure perimeter panels. … Photo 9 clearly shows that the extent of local damage from the roof panel fall occurred directly below the fall location. The vibration and energy of the panel fall only knocked free spalled concrete at the immediate area below the fallen panel".  See Exhibit I at Ex.

5 thereto, H. Greve's June 12, 2020 report at pp. 1, 4 and photo 9.  Mr. Barbato testified similarly that he did not observe any additional damage.  *See* Travelers Statement of Facts at ¶ 49.

The only alleged evidence submitted by Plaintiff in support of its allegation as to direct physical loss to the rest of the Garage are the suppositions of its proffered engineering expert Jeremy Urban, P.E.  Travelers has filed a *Daubert* Motion at ECF #59 to exclude Mr. Urban's opinions in this regard as not meeting the reliability requirement, which Travelers incorporates herein by reference but adds the following summary.

First, Mr. Urban could only say that there is a possibility of additional damage outside of the impact area and then self-validates his hypothesis about the existence of this potential additional damage. He could not even identify the location of this alleged additional damage, which is Plaintiff's burden to prove.  For example, he writes in his November 5, 2018 report, "the level of investigation necessary for a complete understanding of damages rendered would likely require significant time and could potentially conclude that full replacement of damaged structural members, in lieu of just concrete patching and repairs, may be required for those obviously affected beneath the impact and possibly even for members further away."  See Ex. J at Ex. 3 thereto, PVE's November 5, 2018 report at p. 2. He testified "obviously, it [fallen panel event] impacted beneath the impact and **possibly** even further away."  Ex. J, Dep. of J. Urban at p. 138, lns. 23-24 (emphasis added).

Although during his deposition he attempted to identify photographs showing visual evidence of damage beyond the impact area, he admitted that he had no idea if

the conditions reflected in these photos were present before the event.  For example, he identified certain areas around columns as showing potential impact damage from the Incident, but he admitted to not knowing if these conditions were present before the date of the Incident.  Ex. J, Dep. of J. Urban at p. 163, ln. 9 – p. 165, ln. 9.  When asked as to why he could not opine as to the extent and cause of delamination between steel elements and concrete in the area of impact, he testified "so, I was not there beforehand. So, for example, a car could have hit a column or a beam or a spandrel two days before, so I cannot with certainty say what the extent of damage could be." *Id. at* p.111, lns. 1-5.   He ultimately conceded "so, again, I can't say, you know, with confidence what damage was there before and what damage was there after and what the extent of that damage was caused."  *Id.* at p. 117, lns. 7- 20.

Further, Mr. Urban could not cite to any data or analysis to support his opinions as to the existence of additional damage.  He claims that testing is needed to support his hypothesis, but he did not do the testing.  He does not reference any condition at the property nor did he perform any testing or calculation, which he concedes are necessary to establish the existence of other damage.  For example, at his deposition he maintained that the Incident caused more damage than what was visually apparent but he could not describe the extent of this suspected damage as he never performed any additional investigation.  *Id.* at p. 112, lns. 8-16.  He can only offer guesswork.  The reason as to why Mr. Urban did not conduct any further analysis is obvious – the County had already decided to demolish the Garage and the two adjacent buildings well before Mr. Urban issued his November 5, 2018 report.  *See* Travelers' Statement of Facts at ¶ 57.

Plaintiff's proffered expert can only testify to "possibilities" and the "potential" of additional damage.  Plaintiff cannot meet its burden of proof to show the existence of additional damage or that the alleged additional damage resulted from the Incident, which are requirements of coverage. As stated by this District, "[o]pinions merely expressing possibilities do not suffice to support the admissibility of expert testimony; an expert must supply more than a bottom line to be of value to the judicial process." *Kemmerer v. State Farm Ins. Co.'s*, 2004 WL 87017, at *3 (E.D. Pa. Jan. 19, 2004) (granting summary judgment to insurer on causation of damages where the insured's expert offered mere possibilities) (citing *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 496 (W.D. Pa. 2003).  Plaintiff has the burden of proof to show direct physical loss resulting from the Incident to areas of the Garage, the location of the damage and that the damage was caused by the subject Incident.  Plaintiff cannot escape this burden by arguing it would be too expensive or too time-consuming to investigate.  Plaintiff has not offered any evidence to meet its burden of proof to show direct physical loss and there is no genuine issue for trial as to the existence of direct physical loss resulting from the Incident outside that documented in the impact area and the J.S. Held repair budget.

> ### 2.    Plaintiff Has Not Offered Any Evidence To Show Evidence Of Direct Physical Loss Or Damage Of The Type Insured To The Toal And Sweney Buildings From The Subject Incident

Simply stated, Plaintiff has not presented any evidence of direct physical loss to the Toal and Sweney buildings from the subject Incident.  No one has testified, reported or indicated that there was any damage whatsoever to the Toal and Sweney buildings from this incident, let alone damage from a cause of loss insured under the Policy. There is no coverage under the Policy for the cost to demolish or repair these buildings.

To the extent Plaintiff argues that the remaining areas of the Garage are covered under the Abrupt Collapse Additional Coverage because the Garage was in danger of failing down or for showing evidence of cracking from the Incident (which Travelers does not concede), it is undisputed that the Garage was still standing after the Incident. No other part of the Garage fell.  It is also undisputed that the Toal and Sweney buildings did not fall down and remained standing after the Incident (up until Plaintiff decided to demolish the buildings).  Sections c (i)-(iii) to the Abrupt Collapse Additional Coverage state this coverage does not apply to "[a] building or any portion of a building that is in danger of falling down or caving in," "a portion of a building that is standing, even if it has separated from another portion of the building"; or "[a] building that is standing or any portion of a building that is standing even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion."  *See* Travelers' Statement of Facts at ¶ 62.

This Policy language is unambiguous. *Miller v. First Liberty Ins. Corp.*, 2008 WL 2468605, at *4 (E.D. Pa. June 17, 2008) (found identical provision to be unambiguous). Plaintiff voluntarily demolished the Garage, Toal and Sweney buildings.  *Id.* at *4 ("construing the Policy to cover voluntary tearing down due to alleged substantial impairment of structural integrity would convert the insurance policy into a maintenance agreement in contravention of the clear language of the parties" (citing *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 169 (Pa. 2005)).  *See also Alexander v. Gen. Ins. Co. of Am.*, 2017 WL 188134, at *2 (D. Conn. Jan. 17, 2017) (allegations of impairment to structural integrity, cracking and bulging of walls are expressly excluded under the definition of collapse under the policy); *Squairs v. Safeco Nat. Ins. Co.*, 25 N.Y.S.3d

502, 502 (N.Y. App. Div 2016.) (no collapse occurred if no abrupt falling down or caving in occurred; state of "imminent collapse" is not "collapse").   No coverage exists for the cost to demolish and replace undamaged buildings.

### 3. Plaintiff's Claim For Coverage For Undamaged Areas Is Inconsistent With The Valuation Provision Of The Policy And General Principals Of Indemnity

The loss valuation provision of the Policy is in accord that Travelers will only pay the cost to replace the lost or damaged property.  *See Pellegrino v. State Farm Fire & Cas.* Co., 2013 WL 3878591, at *4 (E.D. Pa. July 29, 2013), *aff'd*, 568 F. App'x 129 (3d Cir. 2014) (limiting insurer's obligation to pay for damaged property, and not the cost to repair or replace undamaged portions); *Greene v. United Services Automobile Association*, 936 A.2d 1178 (Pa.Super.Ct.2007), (the meaning of "damaged part of the property" means the small portion of the roof that had been damaged and did not require replacing the entire roof and characterized the insureds' "interpretation of the policy language ... [as] unreasonable and absurd").   The same principles apply here where Plaintiff is not only seeking costs to replace undamaged areas of the Garage, but also the cost to demolish and replace two separate buildings.   Plaintiff has never provided a repair budget that does not involve the demolition of all three buildings.

In sum, there is no avenue to coverage available to Plaintiff under the Policy for the cost to demolish and rebuild the Garage, Toal and Sweney buildings.   Should the Court find any issue of fact on the issue for coverage for the fallen panel, Travelers is still entitled to judgment in its favor in regard to Plaintiff's claims for the cost to demolish and rebuild entire Garage and the Toal and Sweney buildings.

**E.      Summary Judgment As To Plaintiff's Statutory Bad Faith And Breach of Implied Covenant of Good Faith And Fair Dealing Claims Is Also Appropriate Because Travelers Did Not Act In Bad Faith As There Was No Coverage Under The Policy**

Plaintiff's third count asserts a claim for statutory insurance bad faith under 42 Pa. C.S. § 8371.  Similarly, Plaintiff's fourth count asserts a claim for Breach of Implied Covenant of Good Faith and Fair Dealing.  There are simply no facts from which a reasonable factfinder could conclude that Travelers acted in bad faith in its handling, investigation, and in the denial of the claim.

Plaintiff has to prove that Travelers: 1) did not have a reasonable basis for denying benefits under the policy; and 2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim.  *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 193 (Pa. 2007).  A plaintiff is required to establish bad faith by ***clear and convincing evidence***, which requires evidence "so clear, direct, weighty and convincing as to enable the fact finder to make its decision with clear conviction." *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 752 (3d Cir. 1994) (emphasis added). "In a bad faith case, summary judgment is appropriate when there is no clear and convincing evidence that the insurer's conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Bostick v. ITT Hartford Group, Inc.*, 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999).  An insured's bad faith claim necessarily fails when its breach of contract claim fails (*i.e.*, when there is no coverage under the policy). *Id.* Moreover, an insurer's conclusion on a coverage issue, even if incorrect, does not constitute bad faith if it was merely negligent. *Id.; Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005). Plaintiff will not be able to meet this heightened burden at the summary judgment stage, and Travelers is entitled to judgment as a matter of law

on Counts III and IV.

Here, Plaintiff is not entitled to any coverage under the Policy as damages sought are specifically excluded by the Policy. As discussed above, Travelers did not breach the Policy by denying coverage because the Incident was not covered. There can be no bad faith where there is no coverage for the claimed loss. *See, e.g., Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 750 (3d Cir. 1999).

Assuming *arguendo* that coverage existed under the Policy, Travelers' coverage position was based not only on a reasonable interpretation of the exclusionary language of the Policy, but also upon the thorough investigation into the underlying Incident, including the findings and opinions of its expert, Harald Greve. Travelers promptly investigated Plaintiff's claim. Travelers' adjuster provided constant updates and worked closely with Plaintiff's representatives to come to a prompt conclusion of the claim.

To the extent it is argued that Travelers' investigation and response to the claim was somehow delayed, such delays were the result of the Plaintiff's failure to cooperate with reasonable and relevant information requests. Travelers made several requests for information designed to uncover information about the pre-loss condition of the Garage and Plaintiff's knowledge of same. While an insurer is required to accord the interests of its insureds the same consideration it gives its own, it is not required actively to submerge its own interests. *See Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999), *aff'd*, 234 F.3d 1265 (3d Cir. 2000). An insurance company has a right under its policy to conduct a thorough investigation of a claim. *Sanders v. State Farm Ins. Co.,* 47 Pa. D. & C.4th 129, 142 (Com. Pl. 2000), aff'd, 777 A.2d 516 (Pa. Super. Ct. 2001); *Kosierowski*, 51 F.Supp.2d at 589. Rather than share the information

in its possession responsive to these requests, Plaintiff refused to turn over all of the reports in its possession, including reports that specifically referenced the steel corrosion in the Garage. *See* Travelers' Statement of Facts at ¶¶ 73-74.

Travelers' coverage decision was informed by the inspection of an independent expert. An insurer's use of independent experts has long been accepted in Pennsylvania law, which holds that an insurer does not act in bad faith when it reasonably relies upon an independent expert. *See, e.g., Bostick, 56 F. Supp. 2d at 580*; *El Bor Corp. v. Fireman's Fund Ins. Co.*, 787 F.Supp.2d 341, 349 (E.D. Pa. 2011) (insurance company's reliance on engineer's findings as a basis for denial of coverage provides reasonable grounds to deny benefits). Pennsylvania courts have uniformly found there is no bad faith in these circumstances. *See e.g., The Frog, Switch & Manufacturing Co.*, 193 F.3d at 750-51; *Bostick*, 56 F. Supp. 2d at 587 ("[w]hether or not the defendants' expert correctly assessed the cause of damage, the plaintiffs have not presented evidence to substantiate their claim that [defendant] acted unreasonably").

In sum, Travelers completed a prompt and thorough investigation. Travelers acted properly, timely and reasonably in its investigation of Plaintiff's claim. An insurer's refusal to pay, based on a legitimate, genuine dispute as to coverage does not equate to bad faith. *Krisa v. The Equitable Life Assurance Society*, 113 F. Supp. 2d 694, 704 (M.D. Pa. 2000) ("bad faith is not established if there is any reasonable interpretation that supports a coverage determination favoring the insured").

Moreover, Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing in Count IV is not legally cognizable. "Under Pennsylvania law,

Plaintiff cannot raise a separate claim for breach of the implied contractual duty to act in good faith in this case because such a common law claim merges with Plaintiff's breach of contract claim she raised in Count I of her Complaint." *Cozzone v. AXA Equitable Life Ins. Soc. of the U.S.*, 858 F. Supp. 2d 452, 457 (M.D. Pa. 2012) (citing *Cummings v. Allstate Ins. Co.*, 832 F.Supp.2d 469, 472-74, (E.D.Pa. 2011)).   Further, since Plaintiff's claim is for first-party property coverage Courts have not permitted a claim for common law bad faith in the first-party property context. *Bukofski v. USAA Cas. Ins. Co.*, 2009 WL 1609402, at *5 (M.D. Pa. June 9, 2009) (dismissing common law bad faith claim sounding in tort, stating that "Pennsylvania courts have refused to allow a common law bad faith' tort action for an insurer's violation of the implied covenant of good faith and fair dealing in the first party insurance claim setting").

There is no genuine issue of fact for trial on Plaintiff's unsupported bad faith claims in Counts III and IV.

## VI.     CONCLUSION

For all of the reasons stated above, Travelers requests this Honorable Court to grant its motion for summary judgment as no issues of material fact remain and its entitled to judgment on same.   Travelers appropriately determined there was no coverage for the damages sought by the Plaintiff as such damages are excluded by the express language of the contract between the parties and did not act in bad faith when it did so.  Travelers seeks judgment in its favor that:

1.     There is no coverage under the Policy for the subject Incident and judgment is entered in Travelers' favor as to Count I of Plaintiff's Complaint for Declaratory Relief;

2.    Travelers did not breach the contract of insurance and judgment is entered in Travelers' favor as to Count II of Plaintiff's Complaint for Breach of Contract; and,

3.    Plaintiff's statutory bad faith count in Count III and cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing in Count IV fail as a matter of law and are dismissed with prejudice and judgment is entered in Travelers' favor.

BUTLER WEIHMULLER KATZ CRAIG LLP

s/Michael J. McLaughlin
RICHARD D. GABLE, JR., ESQ.
rgable@butler.legal
MICHAEL J. McLAUGHLIN, ESQ.
mmclaughlin@butler.legal
1818 Market Street, Suite 2740
Philadelphia, PA  19103
Telephone: (215) 405-9191
Fax:  (215) 405-9190
*Attorneys for Defendant, Travelers Property*
Dated: <u>October 19, 2020</u>        *Casualty Company of America*

## CERTIFICATE OF SERVICE

I, Michael J. McLaughlin, hereby certify that on this 19th day of October, 2020, a true and correct copy of Defendant, Travelers Property Casualty Company of America's Brief in Support of Its Motion for Summary Judgment, has been served via the Court's electronic filing system upon the following counsel of record:

Arthur R. Armstrong, Esq.
Anderson Kill P.C.
1760 Market Street, Suite 600
Philadelphia, PA 19103

Ethan W. Middlebrooks, Esq.
Allen R. Wolff, Esq.
Anderson Kill P.C.
1251 Avenue of the Americas
New York, New York 10020

*Attorneys for Plaintiff*

s/Michael J. McLaughlin
MICHAEL J. MCLAUGHLIN, ESQ.