**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COUNTY OF DELAWARE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 2:19-cv-02430-JMY |
| | : | |
| TRAVELERS PROPERTY CASUALTY | : | |
| COMPANY OF AMERICA | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF THE COUNTY OF DELAWARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA**

**ANDERSON KILL P.C.**

Arthur R. Armstrong, Esq.
1760 Market Street, Suite 600
Philadelphia, PA  19103
Telephone: (267) 216-2700
E-mail: aarmstrong@andersonkill.com

Allen R. Wolff, Esq.
Ethan W. Middlebrooks, Esq.
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 278-1000
Facsimile: (212) 278-1733
E-mail: awolff@andersonkill.com
E-mail: emiddlebrooks@andersonkill.com

*Attorneys for Plaintiff County of Delaware*

1

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................ 1

II.  FACTS ............................................................................................................... 2

III. SUMMARY JUDGMENT STANDARD ......................................................... 9

IV.  STANDARDS OF INSURANCE POLICY CONSTRUCTION ......................... 10

V.   ARGUMENT .................................................................................................... 12

     A.    Travelers Breached Its Obligations Under the Policy by Denying the County's Claim. ................................................................................ 12

          1.    The Abrupt Collapse of the Concrete Spandrel is a Covered Claim. ........................................................................................ 13

          2.    Despite a General Exclusion for "Collapse," the Policy Specifically Added Coverage for "Abrupt Collapse." .............. 16

          3.    The Abrupt Collapse of the Concrete Spandrel Was the Result of Hidden Decay and Was Not Known to the County of Delaware. ............................................................................. 17

               (a)    The Failure of the Welds was Caused by Decay. ......... 17

          4.    The Policy is Not Ambiguous, but Any Ambiguity Is Construed in Favor of the County, Whether Broadly Finding Coverage or Narrowly Applying Exclusions. ............ 21

               (a)    The Decay was Hidden and Not Known to the County. ...................................................................... 22

               (b)    Abrupt Collapse Additional Coverage Applies Where the Abrupt Collapse is Caused In Part by Defective Methods of Construction and In Part by Hidden Decay. .............................................................. 25

     B.    The Policy Provides for Replacement Cost of the Garage, Toal and Sweney Buildings ................................................................................ 28

     C.    By Wrongfully Denying the County's Claim, Travelers Is Estopped from Challenging the Reasonableness of the County's Determination that the Garage Must Be Replaced. ............................... 28

     D.    Replacement Cost of the Garage is at Least $18,239,180.15 ............... 30

VI.  CONCLUSION ................................................................................................. 31

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alfiero v. Berks Mut. Leasing Co.*,
    500 A.2d 169 (Pa. Super. Ct. 1985)............................................................29, 30, 31

*Anderson v. Liberty Lobby, Inc.*,
    477 US. 242 (1986)................................................................................................10

*Betz v. Erie Ins. Exch.*,
    957 A.2d 1244 (Pa. Super. 2008)..............................................11, 14, 15, 17, 20

*Bishops, Inc. v. Penn Nat. Ins.*,
    984 A.2d 982 (Pa. Super. Ct. 2009)................................................................20, 21

*Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mut. Ins. Co.*,
    123 A.2d 413 (Pa. 1956)........................................................................................22

*Bubis v. Prudential Prop. & Cas. Ins. Co.*,
    718 A.2d 1270 (Pa. Super. Ct. 1998).....................................................................17

*Burgunder v. United Specialty Ins. Co.*,
    No. CV 17-1295, 2018 WL 2184479 (W.D. Pa. May 11, 2018)......................11, 12

*Canal Ins. Co. v. Underwriters at Lloyd's London*,
    435 F.3d 431 (3d Cir. 2006)...................................................................................12

*Dr. Mark Piechota Crefeld Sch. v. Hartford Fire Ins. Co.*,
    No. 11-cv-7188, 2013 WL 271809 (E.D. Pa. Jan. 23, 2013).................................11

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,
    84 P.3d 385 (Cal. 2004) ........................................................................................15

*East Hampton Congregational Church v. Church Mutual Ins. Co.*,
    322 F. Supp. 3d 230 (D. Mass. 2018), *aff'd* 916 F.3d 86 (1st Cir. 2019)..............27

*Emplrs. Mut. Cas. Co. v. Penn Twp.*,
    No. 03-cv-6507, 2005 U.S. Dist. LEXIS 3432 (E.D. Pa. Feb. 14, 2005) ..............12

*Fedas v. Ins. Co. of State of Pennsylvania*,
    151 A. 285 (Pa. 1930)............................................................................................29

*Gatti v. Hanover Ins. Co.*,
    601 F. Supp. 210 (E.D. Pa. 1985) ...................................................................11, 13

ii

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*Gold v. State Farm Fire & Cas. Co.*,
   880 F. Supp. 2d 587 (E.D. Pa. 2012) ............................................................12, 13

*Madison Const. Co. v. Harleysville Mut. Ins. Co.*,
   557 Pa. 595, 735 A.2d 100 (1999) ........................................................................10

*Malbco Holdings LLC v. AMCO Ins. Co.*,
   719 F. Supp. 2d 1311 (D. Ore. 2010) ..............................................................26, 27

*Melkir Capital, LP v. Erie Ins. Exch.*,
   No. 302-WDA-2017, 2018 WL 1177765 (Pa. Super. Ct. Mar. 7, 2018) ................11

*Meyer v. CUNA Mut. Ins. Soc.*,
   548 F.3d 154 (3d Cir. 2011) .................................................................................28

*Miller v. Boston Ins. Co.*,
   218 A.2d 275 (Pa. 1966) ......................................................................................11

*Neth. Ins. Co. v. Butler Area Sch. Dist.*,
   256 F. Supp. 3d 600 (W.D. Pa. 2017) ...................................................................12

*Pappas v. UNUM Life Ins. Co. of Am.*,
   856 A.2d 183 (Pa. Super. Ct. 2004) .......................................................................10

*PMW Real Estate Mgmt., LLC v. State Farm Fire & Cas. Co.*,
   No. 2:11-cv-1395, 2013 WL 3993759 (W.D. Pa. Aug. 5, 2013) ...........................19

*Rompola v. Lehigh Valley Hosp.*, No. 03-cv-2993,
   2004 WL 503411 (E.D. Pa. Mar. 11, 2004) ...........................................................9

*Simmons v. Allstate Ins. Co.*,
   No. CIV.A. 96-5112, 1997 WL 214848 (E.D. Pa. Apr. 28, 1997), *amended*,
   No. CIV. A. 96-5112, 1997 WL 430997 (E.D. Pa. July 23, 1997) .........................23

*Standard Venetian Blind Co. v. Am. Empire Ins. Co.*,
   503 Pa. 300, 469 A.2d 563 (1983) ........................................................................10

*Trap Rock Indus., Inc. v. Local 825, Int'l Union of Opp. Engineers, AFL-CIO*,
   982 F.2d 884 (3d Cir. 1992) .................................................................................10

*Wall Rose Mut. Ins. Co. v. Manross*,
   939 A.2d 958 (Pa. Super. Ct. 2007) ................................................................17, 18

iii

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 56(c) ...................................................................................................................9

I.        **INTRODUCTION**

The Plaintiff County of Delaware (the "County") purchased an all-risk property insurance policy from Defendant Travelers Property Casualty Company of America ("Travelers").  This policy covered property throughout the County, including a parking garage and two adjacent buildings (the Toal and Sweney buildings).  The policy included an additional coverage for "Abrupt Collapse" and provided policy limits of over Four Hundred and Thirty Five million dollars ($435,000,000).

On July 28, 2018, an eleven-ton concrete spandrel beam abruptly collapsed from the high roof area of the parking garage and fell about nine feet to the third-floor driving surface.  This abrupt collapse punctured the deck below and rained chunks of concrete onto the deck below that, prompting the immediate closure of the garage and the Toal and Sweney buildings.

The County promptly tendered a claim under the policy to Travelers.  Travelers denied the County's claim, asserting certain general exclusions and arguing that the abrupt collapse was not caused by decay, which is an element of the Abrupt Collapse additional coverage.  Travelers also asserted that the decay was not hidden and was known to the County.

Travelers' denial of the County's claim was improper and in bad faith.  Accordingly, The County sued Travelers for breach of the policy and common-law and statutory bad faith.

The County now files a motion for partial summary judgment as to the following issues:

1.        The abrupt collapse of the concrete spandrel beam is a Covered Cause of Loss under the Policy's Abrupt Collapse additional coverage.

2.        Travelers breached its obligations under the policy by wrongfully denying the County's claim.  Judgment in favor of the County as to Count I (Declaratory Judgment) and Count II (Breach of Contract) is warranted.

1

3.      Because Travelers wrongfully denied the County's claim, Travelers is estopped from challenging the reasonableness of the County's determination that replacement of the Garage was necessary.

4.      The Policy provides coverage for the Garage on a replacement-cost basis, and the measure of replacement cost in this case has been conceded by Travelers to be no less than $18,239,180.15.  Damages in excess of this amount shall be proven at trial.[1]

As set forth below, there is no genuine issue of material fact as to these issues and judgment in favor of the County is warranted.

## II.      FACTS

### The Garage

The County owned and operated a parking garage located at 201 West Front Street in Media, Pennsylvania (the "Garage").  SF ⁋ 1.[2] The Garage was used for employee and jury member parking.  *Id.*

The Garage was a four-level, pre-cast concrete structure, with pre-cast concrete elements such as columns, girders, spandrels, and double-tee prestressed beams.  SF ⁋ 2.  It was constructed adjacent to and surrounding two older office buildings known as the Toal Building and the Sweney Building.  SF ⁋ 3.  The Garage was built around the Toal Building, and immediately adjacent to the Sweney Building.  SF ⁋⁋ 4-5.

### The Policy

Travelers sold the County a Deluxe Property insurance policy, with policy number 630-1H967220-TIL-18, for the policy period June 26, 2018 through June 1, 2019 (the "Policy").[3]  SF

---

[1]     The present motion does not seek Summary Judgment as to Count III (Statutory Bad Faith) or Count IV (Common Law Bad Faith).

[2]     "SF" refers to the County's Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment, filed herewith.

2

¶ 6.  The Policy's limit of insurance for the County's buildings and business personal property is $435,448,433.  SF ¶ 8.

The Policy defines "Covered Property" as, among other things, "Buildings."  SF ¶ 9. The Garage is "Covered Property" under the Policy.  *Id.*

The Garage is listed on a Policy schedule for a replacement cost value ("RCV") basis. SF ¶ 10.  "Replacement cost is the cost to replace Covered Property at the time of loss or damage without deduction for depreciation."  SF ¶ 11.  Under the Policy terms, Travelers will pay RCV when "the lost or damaged property is actually repair or replaced."  SF ¶ 12.  Until such time of actual repair or replacement Travelers "will pay on an actual cash value basis."  *Id.*

The Policy provides that Travelers "will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss."  SF ¶ 13.  A "Covered Cause of Loss" is defined as "RISKS OF DIRECT PHYSICAL LOSS unless the loss is" subject to a listed Policy exclusion or limitation.[4]  *Id.*   Stated otherwise, under the Policy, a direct physical loss is covered unless it is specifically excluded or limited by the main coverage part, an endorsement, or the Policy Declarations.  SF ¶ 14.  For example, the Policy contains an exclusion for "Collapse."  SF ¶ 15.

In addition to coverage under the main coverage part, there are Additional Coverages expressly set forth in the Policy, including the Abrupt Collapse Additional Coverage.  SF ¶ 16. The Abrupt Collapse Additional Coverage provision states in pertinent part as follows:

> (3) Abrupt Collapse Additional Coverage
>
> The term Covered Cause of Loss includes abrupt collapse as described and limited under Paragraphs (a) though (g) below.

---

[3]   "[T]he coverage is better involved in" Deluxe Property insurance policies sold by Travelers as compared to other Travelers' property policies.  SF ¶ 7.

[4]   The Policy does not define "RISKS OF DIRECT PHYSICAL LOSS."  SF ¶ 13.

3

> (a) As used in this Additional Coverage, abrupt collapse means abrupt falling down or caving in of a building or any portion of a building with the result that the building or portion of the building cannot be occupied for its intended purpose.
>
> (b) We will pay for direct physical loss of or damage to Covered Property, caused by abrupt collapse of a building that is insured under this Coverage Form, or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:
>
> > (i) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
> >
> > . . .
> >
> > (iv) Use of defective material or methods of construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling, or renovation is complete, but only if the collapse is caused in part by:
> >
> > > - A cause of loss listed in Paragraphs 3(b)(i) or (3)(b)(ii) above.

SF ¶ 17.

**History of Garage Inspection and Repairs**

The County retained Joseph Barbato and Associates ("JBA") to conduct periodic inspections of the Garage beginning in 2013. SF ¶ 18. After each of its inspections, JBA issued reports regarding recommended repairs. SF ¶ 19. JBA itself did not undertake any of the repairs; often, a contractor named Phillips Enterprises did. SF ¶ 20.

In 2014, Mr. Barbato prepared a report that projected the timeline for continued use of the Garage into the future. SF ¶ 21. Specifically, Mr. Barbato described repairs to maintain the use of the garage for 5, 10 and 15 years into the future. *Id.* The Report states that "should the Owner want to maintain full use of the garage for the next 5 years, *Immediate* and *Category A* repairs should be completed." SF ¶ 22. The County made all the Immediate and Category A repairs. SF ¶ 23.

4

**The Abrupt Collapse of the Spandrel Beam**

Overnight on July 27, 2018, an 8-inch thick, 4-foot 6-inch high, 48-foot long pre-cast concrete spandrel beam (the "Spandrel") abruptly fell from the north end of the high roof level of the Garage.  SF ⸿ 24.  The Spandrel weighed approximately 11 tons.  *Id.*

The Spandrel impacted onto the main-roof level (i.e., top floor) driving surface below. SF ⸿ 25.  The impact caused large puncture holes in the flanges of pre-cast concrete double-tees, and damaged the beams underneath the double-tee slab.  SF ⸿ 26.  The Spandrel's engineering expert opined the impact also caused damage throughout the garage. SF ⸿ 27.

On July 27, 2018, following the abrupt collapse, outside consulting structural engineer for the County Joseph Barbato, among others, inspected the Garage.  SF ⸿ 28.  While onsite, Mr. Barbato recommended the closure of the Garage.   SF ⸿ 29.  The Garage was closed.  *Id.*

On July 30, 2018, JBA published a report regarding the collapse of the Spandrel.  SF ⸿ 30.  In that report, JBA again recommended immediate closure of the Garage, as well as the Toal Building and Sweney Building, and the adjacent streets.  SF ⸿ 31.  JBA also recommended that a demolition plan immediately be developed and implemented of the three structures.  *Id.*  The County followed that recommendation and demolished the structures.  SF ⸿⸿ 32-33. The demolition was completed in March of 2019.  SF ⸿ 33.

**The Cause of the Spandrel's Abrupt Collapse**

The Spandrel was connected to the ends of two concrete girders via six steel weld plates cast into the concrete.  SF ⸿ 34.  There were two upper welds, and four lower welds.  SF ⸿ 35. The Spandrel was connected on site during the original construction with three welds at each girder.  SF ⸿ 34.

5

The two upper welds were concealed on multiple sides by other elements and could not be seen from the garage level below or the garage level above. SF ‖‖ 36-38. The upper welds were "hidden behind the roof panel and between the double-tee roof beams." SF ‖ 38.

The County retained engineering expert Jeremy Urban of PVE LLC ("PVE") to determine the cause of the Spandrel collapse. PVE issued reports on November 5, 2018, and September 11, 2020. SF ‖ 48. Mr. Urban reported that the lower welds could be seen. SF ‖ 39. Mr. Urban noted the internal decay inside the lower welds was hidden from view. *Id.* The lower welds were painted with a rust-inhibiting paint that concealed the existing welds. SF ‖ 40.

Regarding the cause of the abrupt collapse, Mr. Urban opined as follows:

- The cause of the spandrel collapse was the failure of a series of welds, several of which could not be seen while the others were obstructed by what appeared to be zinc rich paint.

- The failure of the welds were caused by a progressive hidden decay of the welds and connected steel elements that were subjected to cyclical loads throughout the life of the building.

- The construction of the welds were initially adequate as evident by the spandrel remaining in place for roughly 50 years; however, a possible lack of fusion of the weld between the base materials became visually evident after the welds failed and the spandrel panel had fallen. If the welds did not have complete fusion, then the decay was proportionally more significant than visually apparent.

- There were no prior visual indications that failure of the subject spandrel panel was imminent.

SF ‖ 41.

In addition, the parties' engineering experts also noted that certain construction defects contributed to the loss. *See* SF ‖ 41 ("a possible lack of fusion of the weld between the base materials became visually evident after the welds failed and the spandrel panel had fallen"). Mr. Urban wrote in his Supplemental Report that "[t]he failed welds observed appeared to have characteristics as being superficial in nature, meaning that the fusion between the welds and the

6

base metal may have been incomplete which only became visually apparent after the failure.")

SF ¶ 43.  Travelers' engineering expert Harald Greve "opined that the heavy concrete roof panel

that fell became dislodged from its support frame because the welds were deficient when

originally installed and those welds experienced long-term fatigue cracking and corrosion."  SF ¶

42.  Mr. Greve also wrote that "[t]he weld quality is poor, and the top welds are deficient. . . .

The heavy precast concrete roof panel fell because the welds were defective, and over time they

experienced fatigue cracking and rusting."  SF ¶ 44.

**The County's Insurance Claim Timeline**

On July 27, 2018, The County provided notice to Travelers that the Spandrel had fallen.

SF ¶ 45.  Travelers issued a reservation of rights that same day, on July 27, 2018.  SF ¶ 46.

On October 30, 2018, Travelers issued a letter denying the County's claim on the asserted

basis of no coverage.  SF ¶ 47.  The County, through counsel, responded to Travelers' denial by

letter dated November 16, 2018.  SF ¶ 49.  That letter included a copy of the November 5, 2018

PVE Report.  *Id.*  Travelers sent another letter to the County on January 7, 2019, wherein

Travelers reiterated its denial of coverage.  SF ¶ 50.  In May 2019, the County filed this coverage

action.  *See* ECF No. 1-1.

**The Insurance Claim**

There is no dispute the County suffered direct physical loss under the Policy.  *See* SF ¶¶

52-53.  However, Travelers invoked the Policy's Collapse exclusion as a basis to deny the

County's claim.  SF ¶ 54.  More specifically, although Travelers has admitted that the Spandrel

collapse was "abrupt," Travelers asserted that the Policy's Additional Coverage for "Abrupt

Collapse" does not apply to the County's claim.  SF ¶¶ 55-56.  Travelers contended that there

was no decay, it was not hidden, and that it was known to the County.  SF ¶ 57.  And yet, in his

October 30, 2018 claim notes, Travelers' claims handler Patrick List described the Spandrel's collapse as resulting from "decay": "Coverage denial being issued on basis of knowledge of existence of decay prior to collapse of concrete spandrel."  SF ⁋ 63.

      The term "decay" is not defined in the Policy.  SF ⁋ 58.  Travelers insists "decay" can only be applied to organic matter.  SF ⁋ 59.  Although Travelers insists on this limited definition of "decay," its witnesses could not identify at their depositions any internal guide or other written material stating "decay" was limited to organic material.  SF ⁋ 60.  Patrick List, the primary claims handler adjusting the County's claim, testified that he based his understanding of the word "decay" on a dictionary, along with his "use of it" and the Policy.  SF ⁋ 61.

      Travelers also denied the County's claim on the asserted basis that the Policy's exclusions for rust, corrosion, deterioration, and wear and tear applied.  SF ⁋ 64.  However, Travelers' coverage expert Dale Frediani testified at his deposition that the term "decay" as used in the Policy was a broad term that would include "corrosion."  SF ⁋ 65.  Mr. Frediani also testified he understood the term "decay" to be "an all-encompassing description of the degradation of the property." SF ⁋ 66.  Similarly, Travelers' 30(b)(6) designee testified that if a loss under the County's policy was found to be the product of decay under the Additional Coverage for Abrupt Collapse, then the exclusion applicable to the general coverage under the policy would not apply.  SF ⁋ 67.

      According to Travelers, "the county didn't follow the recommendation by Joseph Barbato & Associates to make immediate and other repairs to extend the life of the parking garage."  SF ⁋ 70.  But Mr. Barbato testified at his deposition that he had never observed any issue with this Spandrel in any of the inspections prior to the collapse on July 27, 2018.  SF ⁋ 71.  And none of Travelers' witnesses could point to any section of any JBA report that referenced this

Spandrel.  SF ⁋ 72.  In fact, before the Spandrel collapsed, JBA did not observe any visible

conditions that would have indicated that the Spandrel may collapse.  SF ⁋ 73.

When Travelers denied the County's claim, its denial letters stated that there was no

coverage under the Policy.  SF ⁋ 76.  Travelers' denial letters did not state there was a covered

cause of loss but no damages thereunder.  *Id.*  The letters did not assert that the County's

damages were limited to minor repair costs only.  SF ⁋ 78.  In addition to denying coverage,

Travelers never asked the County to present its scope of damages.  SF ⁋ 74.  Travelers did not

send the County a proof of loss form.  SF ⁋ 75.

**Replacement of the Garage**

The County retained expert Steven Burke to render an opinion that calculates the

replacement cost for the Garage as well as for the adjacent Toal and Sweney Buildings.  SF ⁋ 80.

Mr. Burke opined that an "in-kind" replacement of the Garage and Toal and Sweney Buildings

would cost a total of $32,589,630.  SF ⁋ 81.  Travelers engaged cost estimating expert Joshua

Cropp, who opined that an "as was" replacement cost of the Garage alone would be

$18,239,180.15.  SF ⁋ 82.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material

fact" and "the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

To defeat a motion for summary judgment, the non-moving party must "offer evidence that

establishes a genuine issue of material fact that should proceed to trial."  *Rompola v. Lehigh

Valley Hosp.*, No. 03-cv-2993, 2004 WL 503411, at *3 (E.D. Pa. Mar. 11, 2004).  To meet that

burden, the non-moving party "must point to specific, affirmative evidence in the record and not

simply rely on mere allegations, conclusory or vague statements, or general denials in the

pleadings."  *Id.*

9

The Court should grant summary judgment "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 249 (1986).  However, if the nonmoving party's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Opp. Engineers, AFL-CIO*, 982 F.2d 884, 890-91 (3d Cir. 1992) (citations and ellipses omitted).

## IV.     STANDARDS OF INSURANCE POLICY CONSTRUCTION

The interpretive principles applicable to insurance contracts are well-established.  As explained by the Pennsylvania Supreme Court:

> The principles governing our interpretation of a contract of insurance are familiar and well settled.  The task of interpreting a contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.  Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 304-05, 469 A.2d 563, 566 (1983) (citations omitted).  The Court should not interpret the policy "in a vacuum," but should instead consider the "particular set of facts" at issue.  *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999).

"Insurance policies, like all contracts, are enforceable in accordance with the language used and the scope of their coverage may be determined by the court as a matter of law."  *See Pappas v. UNUM Life Ins. Co. of Am.*, 856 A.2d 183, 187 (Pa. Super. Ct. 2004).  While the intention of the parties is paramount:

> [O]ther contract principles have only limited application.  Indeed, our Courts have observed on multiple occasions that "'normal' contract

10

> principles do not apply to insurance transactions." *Drelles v. Mfr's. Life
> Ins. Co.,* 881 A.2d 822, 836 (Pa. Super. 2005). *See also Pressley v.
> Travelers Prop. Cas. Corp.,* 817 A.2d 1131, 1139 (Pa. Super. 2003)
> (quoting *Collister v. Nationwide Life Ins. Co.,* 388 A.2d 1346, 1351 (Pa.
> 1978)) ("Contrary to Travelers' contention, 'normal contract principals
> [a]re no longer applicable in insurance transactions.'"). Rather, "[t]he
> proper focus regarding issues of coverage under insurance contracts is the
> reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas.
> Ins. Co.,* 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998) (quoting *Frain v.
> Keystone Ins. Co.,* 640 A.2d 1352 (Pa. Super. Ct. 1994)).

*Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1252–53 (Pa. Super. 2008). As such, the "reasonable

expectations" of the County guides the interpretation of the insurance Policy sold by Travelers.

Importantly, in this case the Policy is an "all risk" insurance policy, which entails certain

additional considerations: "All risk policies have been interpreted to extend coverage to every

loss occasioned by a fortuitous event, except those caused by the willful act of the insured or

specifically excluded by the policy." *Gatti v. Hanover Ins. Co.*, 601 F. Supp. 210, 211 (E.D. Pa.

1985) (citations omitted); *accord Miller v. Boston Ins. Co.*, 218 A.2d 275, 278 (Pa. 1966) (same).

Pennsylvania law defines a fortuitous event as one "which so far as the parties to the contract are

aware, is dependent on chance." *Gatti*, 601 F. Supp. at 211 (citing *Compagnie Des Bauxites v.

Ins. Co. of N. Am.*, 724 F.2d 369, 372 (3d Cir. 1983)). As such, under an all risk policy, it is

typically a low hurdle for the policyholder to demonstrate that a loss falls within the policy's

grant of coverage. *See, e.g.*, *Burgunder v. United Specialty Ins. Co.*, No. CV 17-1295, 2018 WL

2184479, at *4 (W.D. Pa. May 11, 2018).

"When the parties dispute the coverage provided by an all risk policy, the insurer has the

initial burden of showing that a coverage exclusion applies." *Dr. Mark Piechota Crefeld Sch. v.

Hartford Fire Ins. Co.*, No. 11-cv-7188, 2013 WL 271809, at *2 (E.D. Pa. Jan. 23, 2013)

(citation omitted); *accord Melkir Capital, LP v. Erie Ins. Exch.*, No. 302-WDA-2017, 2018 WL

1177765, at *4 (Pa. Super. Ct. Mar. 7, 2018) (noting that under an "'all-risk' policy, losses are

11

presumed to be covered unless and until the insurance company proves an exclusion applies."); *see also Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006) (citation omitted) ("Where an insurer relies on a policy exclusion as the basis for its denial of coverage . . ., the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense.").

To carry out its burden as to an exclusion, the insurance company must prove that the exclusion unambiguously applies to the loss and no part of the loss falls outside of the scope of the exclusion. *See Burgunder*, 2018 WL 2184479, at *4; *Emplrs. Mut. Cas. Co. v. Penn Twp.*, No. 03-cv-6507, 2005 U.S. Dist. LEXIS 3432, at *8 (E.D. Pa. Feb. 14, 2005) ("A court is required to give effect to a policy exclusion if the exclusion is clearly worded and conspicuously displayed in the policy."). Further, the exclusion is to be read narrowly and in favor of the policyholder's reasonable interpretation. *Burgunder*, 2018 WL 2184479, at *4; *Neth. Ins. Co. v. Butler Area Sch. Dist.*, 256 F. Supp. 3d 600, 611 (W.D. Pa. 2017) (citations omitted).

## V.     ARGUMENT

### A.     Travelers Breached Its Obligations Under the Policy by Denying the County's Claim.

Count II of the County's Complaint is for breach of contract based on Travelers' improper denial of the County's claim. The elements of a breach of contract action are well settled. "A breach of a contract action involves the existence of a contract, a breach of a duty imposed by the contract, and damages." *Gold v. State Farm Fire & Cas. Co.*, 880 F. Supp. 2d 587, 595 (E.D. Pa. 2012) (citing *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. Ct.2005)). There is no dispute the parties entered into a contract (the Policy) and that the failure to pay insurance proceeds properly due constitutes damages. The dispute is whether

Travelers' denial of the County's claim is a breach of a duty imposed by the Policy.  The facts demonstrate Travelers has indeed breached its duty.

> **1.     The Abrupt Collapse of the Concrete Spandrel is a Covered Claim.**

The Policy provides that Travelers "will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss."  SF ¶ 13.  Here, an eleven-ton spandrel fell freely for nine feet crashing through a parking deck, punching holes and raining concrete on the decks below.  SF ¶¶ 24-27. This satisfies the policyholder's requirement to show direct physical loss or damage,[5] shifting the burden to Travelers to show that the entire loss fell within an exclusion.

Likewise, there is no dispute that the Garage is "Covered Property."  The Policy defines "Covered Property" as, among other things, "Buildings," and the Garage is specifically scheduled on the Policy.  *See* SF ¶¶ 9-10.  Travelers' does not dispute the Garage is Covered Property under the Policy.  *See* SF ¶ 9.

Therefore, the only question the Court must answer in order to determine whether coverage under the Policy has been triggered is whether the abrupt collapse of the Spandrel was caused by a "Covered Cause of Loss."  The Policy defines "Covered Cause of Loss" as "RISKS OF DIRECT PHYSICAL LOSS [sic] unless the loss is" subject to a Policy exclusion or limitation.  SF ¶ 13.  "Risks of Direct Physical Loss" is not defined in the Policy.  *Id.*

As noted above, a policy structured in this way is an "All Risk" Policy, which means it covers all risks of loss except those that are specifically excluded.  *See Gatti*, 601 F. Supp. at 211.  Travelers may attempt to argue that "Abrupt Collapse" is an "exception" to the "Collapse"

---

[5]    Travelers' coverage expert admitted the abrupt collapse caused physical damage.  *See* SF ¶ 52.

exclusion and, therefore, the County bears the burden of proving coverage.  The Court should not be misled in this regard for a number of reasons.

First, the Policy provides coverage for Abrupt Collapse not as an exception to an exclusion but rather as an <u>additional coverage</u>.  *See* SF ₱₱ 16.  Where coverage is extended through an "additional coverage," the policy's general exclusions do not apply.  Rather, only those exclusions which may be contained in the additional coverage section apply.  *See* SF ₱ 68.

In *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1255–57 (Pa. Super. Ct. 2008), the insurance company tried to avoid this fundamental rule.  The Court rejected the effort:

> Nor, in asserting technical distinctions between coverage extensions and exclusions, does Erie acknowledge the long standing mandate of our jurisprudence that all portions of an insurance contract must be read together. Indeed, its argument appears to treat the point in the policy at which the exclusion appears as the dispositive element in determining where the burden of proof must rest to show whether an event is covered. Under Erie's construct, it would appear that if an exclusion appears in the language of the primary policy, the burden rests on the insured to establish coverage even if the insured later purchases an endorsement that nullifies the terms of that exclusion. This distinction, which seeks to redirect the burden of proving coverage depending upon whether and when the endorsement is purchased poses an artificial distinction that cannot be squared with the rules governing interpretation of contracts, the reasonable expectations of the insured, or the legal basis of an "all-risks" policy.

*Betz v. Erie Ins. Exch.*, 957 A.2d at 1255–57 (internal citations omitted).

Similarly, Pennsylvania courts have rejected attempts by insurance companies to try to shift the burden to the policyholder to demonstrate coverage by treating an all risk policy as if it were a "named peril policy."[6]  The Court in *Betz* was faced with just such an argument by the insurer:

---

[6]   As contrasted with an "all risks" policy which covers all loss unless specifically excluded, "[u]nder named-peril policies, an insurer agrees to indemnify its insured for losses resulting

14

In support of its contention that the Betzes, as insureds, must bear the burden of showing coverage, Erie analyzes one case that applies coverage under a named peril coverage extension and one that applies an exception to a policy exclusion. In analyzing these cases, however, Erie does not fully reconcile the fact that the policy it issued to the Betzes was an "all-risks" policy that by definition "covers every kind of insurable loss except what is specifically excluded." Black's Law Dictionary 815 (8th ed.2004); *see also Miller v. Boston Ins. Co.,* 218 A.2d 275, 278 (Pa. 1966) ("[A] policy against 'all risks,' ... ordinarily covers every loss that may happen, except by the fraudulent acts of the insured.").

957 A.2d at 1255–57 (internal citations and footnote omitted).

The *Betz* Court also noted that "[a] defense based on an exception or exclusion in a policy is an affirmative one, and the burden is cast upon the defendant to establish it." *Id.* Moreover, the Court recognized that under an "all risks" policy the burden is upon the insured only "to show *that a loss has occurred;* thereafter, the burden is on the insurer to defend by showing that the loss falls within a specific policy exclusion." *Id.* The court rejected the insurance company's attempt to require the policyholder to not only demonstrate a loss has occurred but to also "demonstrate coverage under the terms of the policy." On this point, the Court reasoned:

> Regardless of whether the loss in question is cognizable under the language of the basic policy or under an endorsement purchased separately, that loss is a claim within the coverage provided by the policy. So long as reasonable people could conclude that the claimed loss is covered by language anywhere in the policy *or* the amendatory endorsements, the insured has carried his burden as concerns an "all-risks" policy. Any other construct would merely encourage insurers to orchestrate a shell game of exclusions and exceptions to exclusions (or "named peril coverage extensions") in full recognition that the ultimate risk of loss would rest upon the insured notwithstanding his payment of an extra premium for coverage he reasonably thought he was getting.

*Id.* (internal citations omitted).

---

from certain risks of loss or damage which are specifically enumerated within the provisions of the policy." *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 84 P.3d 385, 388 (Cal. 2004).

Here, the Policy contains an exclusion for "Collapse."  SF ⁋ 15.  Travelers invokes this

exclusion as a basis to deny the claim.  *See* SF ⁋ 54.  Despite the Policy containing an Additional

Coverage for "Abrupt Collapse," Travelers argues it does not apply.  *See* SF ⁋⁋ 16-17, 56.

Travelers' position is unsupported by fact or law and is belied by the admissions of the

Travelers' claims handlers, the engineer appointed by Travelers to investigate the cause of loss,

and Travelers' own insurance expert as to the meaning of material policy terms.

>       **2.       Despite a General Exclusion for "Collapse," the Policy Specifically
>               Added Coverage for "Abrupt Collapse."**

The Policy sold to the County of Delaware contains an "additional coverage" for certain

types of collapses, namely those that constitute an "abrupt collapse."  *See* SF ⁋ 16.  The pertinent

Policy language is as follows:

>    (3) Abrupt Collapse Additional Coverage
>
>    (d) We will pay for direct physical loss of or damage to Covered Property,
>        caused by abrupt collapse of a building that is insured under this
>        Coverage Form, or that contains Covered Property insured under this
>        Coverage Form, if such collapse is caused by one or more of the
>        following:
>
>>        (i) Building decay that is hidden from view, unless the presence of
>>        such decay is known to an insured prior to collapse; . . . .
>
>>        (iv) Use of defective material or methods of construction,
>>        remodeling or renovation if the abrupt collapse occurs after the
>>        construction, remodeling, or renovation is complete, but only if the
>>        collapse is caused in part by:
>
>>>            • A cause of loss listed in Paragraphs 3(b)(i) or (3)(b)(ii)
>>>              above.

SF ⁋ 17.

The additional coverage makes clear that Travelers must "pay for direct physical loss of

or damage to Covered Property, caused by abrupt collapse of a building that is insured under this

Coverage Form…caused [in whole or in part] by… (i) Building decay that is hidden from view,

16

unless the presence of such decay is known to an insured prior to collapse[.]"  *Id.*  Travelers

contends that the abrupt collapse of the spandrel was not caused in any way by decay and that

even if it was, Travelers contends, that decay was not hidden and was known to the insured.

> **3.    The Abrupt Collapse of the Concrete Spandrel Was the Result of
> Hidden Decay and Was Not Known to the County of Delaware.**

> **(a)    The Failure of the Welds was Caused by Decay.**

There can be no reasonable dispute that the failure of the welds was caused by decay.

The plain and ordinary meaning of "decay" properly describes the failure of the welds which

caused the abrupt collapse of the Spandrel.  Travelers attempts to avoid covering the County's

claim by asserting the term "decay" can only be applied to organic matter.  *See* SF ⸿ 59.

Travelers did not define "decay" in the policy.  SF ⸿ 58.  To be sure, no such "organic matter"

limitation otherwise appears anywhere in the Policy.  Neither Travelers' fact witnesses, coverage

expert witness, nor 30(b)(6) representatives could point to any publicly available authority that

limits the meaning of the term "decay" to only organic material.  In fact, Travelers' witnesses

could not even identify any internal guide or other written material that suggested the definition

of "decay" was limited to organic material.  SF ⸿ 60.

Where a term is not defined in an insurance policy, as a matter of law it should be given

the plain meaning as would be consistent with a policyholder's expectations.  *See Bubis v.

Prudential Prop. & Cas. Ins. Co.,* 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998) (quoting *Frain v.

Keystone Ins. Co.,* 640 A.2d 1352 (Pa. Super. Ct. 1994)) ("[t]he proper focus regarding issues of

coverage under insurance contracts is the reasonable expectation of the insured.").  Pennsylvania

courts have recognized that an appropriate source of information to determine the plain meaning

of a term in an insurance policy is a dictionary.  *See e.g.*, *Wall Rose Mut. Ins. Co. v. Manross,*

939 A.2d 958, 962 (Pa. Super. Ct. 2007) (infra).

Where a term such as "decay" is not defined in an insurance policy, they "are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions." *Manross,* 939 A.2d at 962.

Indeed, Patrick List, Travelers' primary claims handler adjusting the County's claim, testified that he based his understanding of the word "decay" on a dictionary, along with his "use of it" and the Policy (although he confirmed that "decay" is not defined anywhere in the Policy). *See* SF ⁋⁋ 58, 61.  Moreover, Travelers' own coverage expert testified emphatically that it was appropriate for an insurance company to utilize a dictionary in order to determine the appropriate meaning of a term which is not in an insurance policy.  SF ⁋ 62.  Mr. Frediani testified as follows:

> Q.   Mr. List testified that in interpreting the property [sic] he may use a dictionary with respect to a given term. Do you think using a dictionary is an appropriate source material for a claims adjuster in reviewing a policy?
>
> A.   Absolutely, yes.
>
> Q.   Why is that?
>
> A.   Because a dictionary is the source of defining terms. And if a term -- if there is some question about what a term means, it makes sense to go to a dictionary. That is what I have applied for the last 50 plus years.

*Id.*

Consulting a dictionary regarding the term "decay" makes clear that there are multiple definitions of "decay," which, if applied, would plainly cover the County's Claim. Indeed, the District Court for the Western District of Pennsylvania engaged in just this exercise in evaluating insurance coverage for a collapse caused by mortar that had decayed:

> Courts construing the term "hidden decay" have interpreted it to mean…"decomposition," "a process of wasting away," "a decline in quality." The Oxford Dictionary and Thesaurus (American ed.1996).

18

decay has also been defined as "[w]asting or wearing away, disintegration, dilapidation, ruinous condition." *Norfolk & Dedham Mut. Fire Ins. Co. v. DeMarta*, 799 F. Supp. 33, 35 (E.D. Pa. 1992) (quoting IV Oxford English Dictionary, 332 (Clarendon Press, 2d ed.1989)).

*PMW Real Estate Mgmt., LLC v. State Farm Fire & Cas. Co.*, No. 2:11-cv-1395, 2013 WL 3993759, at *5 (W.D. Pa. Aug. 5, 2013).

Nevertheless, Travelers ignored the multiple dictionary and other definitions of "decay" that would provide coverage. Instead, Travelers' claims' handlers applied a secret definition of decay that only they knew. They could not describe with any certainty where this hyper-specific definition came from – just that it served to deny coverage to the County.

Astonishingly, even on the very day that Travelers sent its denial letter to the County, in which it asserted the abrupt collapse additional coverage did not apply because there was no decay, <u>Patrick List described the collapse as resulting from "decay" in his own claim notes</u>. SF ⁋ 63. His notes state: "Coverage denial being issued on basis of knowledge of existence of ***decay*** prior to collapse of concrete spandrel." *Id.* (emphasis added).

#### (1) General Exclusions Do Not Apply To Additional Coverage Grants

Travelers has also argued that the collapse was caused not by decay but by corrosion and wear and tear, and is, therefore, excluded. SF ⁋ 64. Travelers' interpretation was rejected by the Pennsylvania appellate courts and is not even supported by Travelers own witnesses.

First, Travelers' own coverage expert testified that the term decay as used in the Travelers' Policy was a broad term that would include corrosion. SF ⁋ 65. When questioned on this topic at deposition, Mr. Frediani testified:

> Q.      Is that your expert opinion in this case?
>
> A.      My opinion that rust, corrosion, deterioration could be also called decay? Yes.

*Id.*

19

Mr. Frediani also testified he understood the term "decay" to be "an all-encompassing description of the degradation of the property."  SF ⁋ 66.  Therefore, even if Travelers' proposed description of the failure as the welds as caused by corrosion rather than decay was correct, the Claim would still be covered.

As a matter of fact and law, terms such as "wear and tear," found in general exclusions, are not applicable here.  These terms are found nowhere in the additional coverage for Abrupt Collapse; instead they are found in an exclusion that only could apply where coverage is sought under the policy's general coverage grant.  Confirming this point, Travelers' 30(b)(6) designee testified that if a loss under the County's Policy was found to be the product of decay under the Additional Coverage for Abrupt Collapse, then the exclusion applicable to the general coverage under the Policy would not apply.  *See* SF ⁋ 67.  Moreover, the County's insurance coverage and bad faith expert confirmed that the standard in the insurance industry is as follows:

> The 2.a exclusion is applied incorrectly by Travelers and thus misrepresents the policy, which is a violation of insurance industry custom and practice, as well as unfair claim settlement practices. 2.a is lifted from the general exclusionary policy wording, and is NOT contained in the Additional Coverage grant for abrupt collapse which trumps the general exclusion.  Custom and practice provides that a general exclusion does not apply when there is a specific additional coverage grant in the policy, be it in the body of the terms and conditions, or by endorsement.

SF ⁋ 68.

Of course, any assertion to the contrary would be absurd.   If the general exclusions – which *exclude* coverage for a loss caused by decay – applied, then coverage could never exist under the additional coverage for Abrupt Collapse – which *requires* a loss caused by decay. Pennsylvania Courts have already rejected similar attempts by insurance companies to advance this inappropriate construction.  *See Betz*, *supra*.  Consistent with *Betz*, the Superior Court elaborated on this concept in *Bishops, Inc. v. Penn Nat. Ins.*, 984 A.2d 982 (Pa. Super. Ct. 2009).

20

In *Bishop's*, the Court disapproved of the reasoning advanced by Travelers in this matter, noting,

"the insured purchased additional coverage ostensibly to make up for deficiencies in the basic

policy only to find its claim denied not by virtue of any limitation on the coverage it bought but

because ancillary language *in the basic policy* barred coverage for *another* excluded loss."

*Bishops*, 984 A.2d at 992–93.  The Court confirmed the insurance company's denial of coverage

on this basis was improper:

> Such a result strikes us as a variant of the "sleight of hand" we
> rejected in *Betz,* allowing an insurer to create the appearance of
> coverage using an amendatory endorsement tailored to cover a
> stated risk only to deny coverage when that risk comes to fruition
> by citing language not suggested by the endorsement….No insured
> would purchase extra coverage for an added premium in the
> expectation that its claim under that coverage would be denied
> because the covered cause of loss, *i.e.,* sewer and drain back-up,
> was itself caused by an excluded cause of loss, *i.e.* flood, when the
> two would naturally occur together.  Nevertheless, the
> interpretation Penn National urges would validate just such an
> unseemly result and in so doing undermine the reasonable
> expectations of the insured.

*Bishops*, 984 A.2d at 992–93.

> **4.      The Policy is Not Ambiguous, but Any Ambiguity Is Construed in
> Favor of the County, Whether Broadly Finding Coverage or
> Narrowly Applying Exclusions.**

Finally, the term "decay" is not ambiguous, but, even if it were, it would be construed in

favor of coverage:

> It is well established that an insurance policy will be construed
> most strongly against the insurer who has prepared it. If there is
> any doubt or ambiguity as to the meaning of the policy, the doubts
> or ambiguities will be resolved in favor of the insured. It is also
> well settle that if an insurance policy is reasonably susceptible of
> two interpretations it is to be construed in favor of the insured in
> order not to defeat, without plain necessity, the claim to indemnity
> which it was the insured's object to obtain.

*Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 123 A.2d 413, 415 (Pa. 1956).  As such, even were Travelers to contend that the term decay was somehow ambiguous, by operation of law, such ambiguity is to be construed in favor the County as policyholder and, therefore, in favor of coverage.

(a)      **The Decay was Hidden and Not Known to the County.**

The Policy provides coverage where the decay was hidden and not known to the insured. Travelers denied the County's claim contending both that the decay was not hidden and that it was known to the County.  *See* SF ⁋ 57.  Travelers' witnesses testified during deposition that the Barbato reports made recommendations regarding repairs and the County did not make the repairs, and, therefore, Travelers concluded that the decay causing the Spandrel to collapse was known to the County.  *See* SF ⁋⁋ 69-70.  Travelers' misunderstanding reflects its failure to properly investigate the loss.

The spandrel was connected to the Garage via six welds, two upper welds, and four lower welds.  SF ⁋⁋ 34-35.  There can be no legitimate dispute that the two upper welds were entirely hidden.  *See* SF ⁋⁋ 37-38.  They were concealed on multiple sides by other concrete elements and could not be seen from the garage level below or the high roof above.  *See id.*  Even Travelers' own engineer who inspected the Garage described them as "hidden" in his report to Travelers. *See* SF ⁋ 38.  Mr. Urban agreed, stating, "The upper welds were hidden due to the proximity of the precast girder and the adjacent double-tee at each end."  SF ⁋ 36.

The lower welds were visible, but the internal decay that led to the actual separation of the elements was hidden from view.  SF ⁋ 39 ("The lower connections were visible however the internal weld decay was obscured."). The welds were painted with a rust-inhibiting paint and there was surface rust visible on certain portions, but the internal decay was not.  SF ⁋ 40 ("At some point, these angles and embed plates appeared to have been painted with a presumed zinc

22

rich paint, which at the time of inspection was flaking and impeded the view of existing welds.")
*See also Simmons v. Allstate Ins. Co.*, No. CIV.A. 96-5112, 1997 WL 214848, at *2 (E.D. Pa.
Apr. 28, 1997), *amended*, No. CIV. A. 96-5112, 1997 WL 430997 (E.D. Pa. July 23, 1997)
(finding decay to be hidden where "sealer paint covered most of the mortar joints so that even
the external troweled portions of most of the mortar were not visible").  It was only after the
welds fractured and the concrete Spandrel collapsed that the internal decay became visible.

Among other things, Mr. Urban confirmed that certain of the welds which decayed were
not visible at all, where others may have been visible, but the internal decay within the welds
was always hidden:

- The cause of the spandrel collapse was the failure of a series of welds, several of which could not be seen while the others were obstructed by what appeared to be zinc rich paint.

- The failure of the welds were caused by a progressive hidden decay of the welds and connected steel elements that were subjected to cyclical loads throughout the life of the building.

- The construction of the welds were initially adequate as evident by the spandrel remaining in place for roughly 50 years; however, a possible lack of fusion of the weld between the base materials became visually evident after the welds failed and the spandrel panel had fallen. If the welds did not have complete fusion, then the decay was proportionally more significant than visually apparent.

- There were no prior visual indications that failure of the subject spandrel panel was imminent.

*See* SF ⁋ 41.

The Abrupt Collapse additional coverage states it does not apply if the decay, while
hidden, is otherwise "known" to the insured.  *See* SF ⁋ 17.  This is a high bar for Travelers to
meet.  When Travelers denied the County's claim, and even to this day, Travelers has never had
evidence that the County actually knew of the internal decay that caused the welds to fail in
locations that were hidden from view.

23

The County retained JBA to conduct periodic inspections of the Garage beginning in 2013.  SF ⁋ 18.  JBA issued reports after each of its inspections regarding recommended repairs; however, JBA itself did not undertake any of the repairs.  SF ⁋⁋ 19-20.  In denying the County's claim, Travelers points to the JBA reports as evidence that the Garage required repairs and that the County knew the spandrel would collapse by not performing every possible repair on the entire Garage.  *See* SF ⁋⁋ 69-70.  But that contention is false and as a mere conclusory assumption, cannot withstand the undisputed facts in the record.

First, none of the JBA reports reference the spandrel that fell <u>at all</u>.  *See* ECF Nos. 1-1 & 57-1, Exhibits A-I (JBA Reports appended as exhibits to the County's Complaint).  Mr. Barbato testified at deposition that he had never observed any issue with this Spandrel in any of the inspections.  SF ⁋ 71.  None of the Travelers witnesses could point to any section of any JBA report that referenced this Spandrel.  SF ⁋7 2.  To be sure, before the Spandrel collapse, JBA did not observe any visible conditions that would have indicated that the Spandrel may collapse.  SF ⁋ 73.  Therefore, Mr. Barbato did not and could not have communicated such a concern to the County.  Travelers' attempt to link the Spandrel abruptly collapsing to a failure to make all recommended repairs in other areas of the Garage is pure fiction.

Second, Travelers is wrong to contend that the County did not make repairs in response to the Barbato recommendations.  As such, any portion of Travelers' coverage denial based on this contention was improper.  In 2014, Mr. Barbato prepared a report that projected the timeline for continued use of the Garage into the future.  SF ⁋ 21.  Specifically, Mr. Barbato described repairs to maintain the use of the garage for 5, 10 and 15 years into the future.  *Id.*  The Barbato reports states that "should the Owner want to maintain full use of the garage for the next 5 years, *Immediate* and *Category A* repairs should be completed."  SF ⁋ 22.  Travelers 30(b)(6) designee,

in justifying the denial, testified "the county didn't follow the recommendation by Joseph

Barbato & Associates to make immediate and other repairs to extend the life of the parking

garage." SF ⁋ 70.  Contrary to Travelers' false assumption, which Travelers then used to deny

the County's claim, Daryl Harris, a project manager in the County's Public Works Department,

testified that the County *made all the emergency and Category A repairs*.  SF ⁋ 23.

    As such, at the time of the abrupt collapse, the County understood it would have "full use

of the Garage" based on its actions in accordance with the JBA reports.  Travelers' contention

that the County somehow "knew" the loss would happen was based only on Travelers'

intentional ignorance as to the actions taken by the County in response to the JBA reports.

> **(b)     Abrupt Collapse Additional Coverage Applies Where the
> Abrupt Collapse is Caused In Part by Defective Methods of
> Construction and In Part by Hidden Decay.**

    The Policy's Abrupt Collapse Additional Coverage is not limited to a single enumerated

covered cause; instead Abrupt Collapse coverage may exist under one or more causes.  *See* SF ⁋

17 ("collapse is caused by one or more of the following").  In particular, the additional coverage

extends to a collapse caused by: "Use of defective material or methods of construction,

remodeling or renovation if the abrupt collapse occurs after the construction, remodeling, or

renovation is complete, but only if the collapse is caused *in part by*" "building decay that is

hidden from view, unless the presence of such decay is known to an insured prior to collapse."

*Id.* (emphasis added).  Stated otherwise, if defective construction methods were used and an

abrupt collapse occurs after the construction is completed, the abrupt collapse is covered if the

collapse is caused in part by hidden decay of which the policyholder did not know prior to the

collapse.  Here, there is without a doubt coverage under this provision.

    Travelers' engineering expert Harald Greve, who was retained by Travelers to determine

the cause of loss, "opined that the heavy concrete roof panel that fell became dislodged from its

25

support frame because the welds were deficient when originally installed and those welds experienced long-term fatigue cracking and corrosion." SF ¶¶ 38, 42. Mr. Greve noted in his original report, provided to Travelers before it denied the County's claim, that "[t]he weld quality is poor, and the top welds are deficient. . . . The heavy precast concrete roof panel fell because the welds were defective, and over time they experienced fatigue cracking and rusting."[7] SF ¶ 44. Mr. Greve also pointed out that the top welds are "hidden behind the roof panel and between the double-tee roof beams." SF ¶ 38. Thus, Travelers' own engineering expert provided an opinion that the abrupt collapse was due in part to defective construction material or methods and in part by decay in hidden welds. *See also* SF ¶ 43.

The County has already demonstrated that it had no knowledge of the decay that caused the abrupt collapse prior to the collapse, *supra*. But even if Travelers (incorrectly) contends that the County somehow had knowledge of the specific decay in the lower welds prior to the abrupt collapse of the spandrel—which the County did not—there is no evidence the County had any knowledge of any decay in the hidden upper welds. Thus, the loss is covered. *See* ¶ 17 (coverage for Abrupt Collapse when there is "defective materials or methods of construction," with "the abrupt collapse occur[ing] after the construction . . . is complete" and "caused ***in part*** by" hidden decay (emphasis added)).

It does not appear that there is any relevant Pennsylvania case law construing this particular policy provision. But the relevant additional coverage policy language at issue in *Malbco Holdings LLC v. AMCO Ins. Co.*, 719 F. Supp. 2d 1311 (D. Ore. 2010), is very similar to that here. In *Malbco*, moist air throughout a hotel lead to "significant hidden decay and rot, as

---

[7]   The County's engineering expert Jeremy Urban found that the welds had been adequate to support the spandrel since the 1970s, but similarly observed that "a possible lack of fusion of the weld between the base materials became visually evident after the welds failed and the spandrel panel had fallen." SF ¶ 41.

26

well as rusting and deterioration of metal nailing plates."  719 F. Supp. 2d at 1317.  At trial, the

issue concerned an abrupt collapse in a particular room of the hotel, even though there was

evidence of decay elsewhere in the hotel.  *See id.* at 1317-18.  The jury found that the

policyholder demonstrated at trial that "the knowledge of some limited decay [elsewhere in the

hotel] is of no consequence if it did not cause the collapse."  *Id.*  The *Malbco* court also had

> instructed the jury that AMCO's Policy covered a collapse if it was
> caused either by decay that was hidden from view and not known
> to Malbco prior to the collapse *or* if it was caused by the use of
> defective material or methods in construction if the collapse was
> caused, at least in part, by decay that was hidden from view and
> not known to Malbco prior to the collapse.

*Id.* at 1318 (emphasis in original).  The court noted that "the construction defect peril provides

coverage if 'at least part' of the resulting decay was hidden from view and not known to Malbco

prior to the collapse."  *Id.*  In other words, "coverage would exist if some decay was not hidden

from view, provided that other decay hidden from view 'at least in part' caused the collapse."  *Id.*

The Court here should adopt the reasoning of the *Malbco* court.  *See also East Hampton

Congregational Church v. Church Mutual Ins. Co.*, 322 F. Supp. 3d 230, 236 (D. Mass. 2018),

*aff'd*  916 F.3d 86 (1st Cir. 2019) ("Church mutual agrees that a collapse occurred within the

meaning of the Policy and concedes that if the Church can show that decay contributed to the

collapse ***even in part***, the collapse is covered under the Additional Coverage—Collapse coverage

part.").  Indeed, the *Malbco* court simply applied a straightforward, plain language reading of the

Abrupt Collapse Additional Coverage, and such reading supports coverage here.

Travelers' engineer has opined that the Spandrel welds were defectively constructed.

There is no dispute those welds were hidden, and Travelers cannot demonstrate that the County

had any knowledge regarding the decay in the welds.  Accordingly, Travelers can show no

genuine issue of material fact that the abrupt collapse of the top welds was caused by defective

27

methods of construction, with the collapse caused at least in part by decay hidden from view.

Thus, the Court should grant summary judgment in the County's favor.

**B.      The Policy Provides for Replacement Cost of the Garage, Toal and Sweney Buildings**

Under the plain language of the Policy, the County is entitled to replacement cost

coverage.  *See, e.g.*, *Meyer v. CUNA Mut. Ins. Soc.*, 548 F.3d 154, 164 (3d Cir. 2011) (citations

omitted) ("Looking first to the plain language of the definition, we note that in Pennsylvania,

when words of common usage are used in an insurance policy, they should be construed in their

natural, plan and ordinary sense.").  The Policy provides: "Replacement cost is the cost to

replace Covered Property at the time of loss or damage without deduction for depreciation."  SF

¶ 11.  There can be no reasonable dispute that this means that Travelers must pay the County

"the cost to replace Covered Property [e.g., the Garage, as well as the Toal Building and Sweney

Building] at the time of loss or damage without deduction for depreciation."  *Id.*

**C.      By Wrongfully Denying the County's Claim, Travelers Is Estopped from Challenging the Reasonableness of the County's Determination that the Garage Must Be Replaced.**

Here, Travelers indisputably has denied the County's claim on the contended basis of no

coverage under the Policy.  *See* SF ¶¶ 47, 40, 76.  Had Travelers instead determined that the

County's claim for Abrupt Collapse was covered, the question would next be the extent of

covered damages.  But that question was never reached due to Travelers' improper denial.[8]

Because Travelers has denied coverage, it should be estopped from contesting the manner

in which the County proceeded with the demolition and toward the replacement of the Garage,

---

[8]      Indeed, Travelers' corporate representative at his deposition continually referred to questions about extent of damage from the County's loss as "hypothetical": "Travelers has already, I have already indicated to you the types of damages that were sustained when this panel fell which unfortunately based on, you know, coverages isn't provided here so your hypothetical is, so it would depend on all the facts of that hypothetical."  SF ¶ 79.

and Toal and Sweney Buildings.  *Cf., e.g.*, *Fedas v. Ins. Co. of State of Pennsylvania*, 151 A. 285, 287 (Pa. 1930) (citing cases) ("Waiver may be inferred from any act evidencing a recognition of liability, ***or from denial of liability*** on other grounds than failure to file proof of loss." (emphasis added)).  Travelers' denial of coverage should operate as a waiver of any right to dispute the reasonableness of the policyholder's action after denial.

For example, if an insurance company wrongfully denies coverage for defense and indemnity as to a third party claim, it does so at its own peril.  The insurance company is estopped from later challenging the policyholder's decision to reasonably settle an underlying case.  As the Superior Court stated in *Alfiero v. Berks Mut. Leasing Co.*, 500 A.2d 169, 171-72 (Pa. Super. Ct. 1985) (internal citations omitted):

> The trial court determined that CNA's denial of coverage had been a breach of its contract of insurance. It concluded, therefore, that Berks could properly negotiate a settlement in an amount that was fair and reasonable and according to terms calculated to protect and preserve the physical assets which were essential to its ability to continue doing business. We agree. An insurer owes an insured the duty of acting in good faith. CNA repeatedly denied any and all obligation to defend or to indemnify Berks. CNA thereby breached its duty to act in good faith and repudiated its contract of insurance. Under these circumstances Berks could properly negotiate a settlement directly with Alfiero so long as it was done in good faith and the settlement was fair and reasonable. The settlement was not unreasonable merely because Berks sought to protect the assets which it used in conducting business.

Here, had Travelers rightfully agreed to cover the loss, but made payment on an actual cash value basis, or limited payment to alleged repairs to the Garage, the parties would have proceeded to address any concerns and disputes they had regarding these issues.  *See* SF ⁋ 12. But the County's claim never reached that point because Travelers denied coverage entirely. Travelers did not make any payments or determine that the County's claim was covered but only needed partial repairs.  It denied coverage.

29

Although Travelers decided the Spandrel's abrupt collapse was not covered under the Policy, Travelers has asserted in this litigation that only limited repairs would be needed as a result of the spandrel's abrupt collapse.  *See* SF ▐ 77.  But Travelers never made any payment for those alleged limited repairs.  Moreover, in its October 30, 2018 denial letter, Travelers noted that its engineer Harald Greve had issued only a preliminary report, which report related to Mr. Greve's opinion on the cause of loss only.  *See* SF ▐ 78.  The denial letter did not assert that the County's damages were in fact limited to minor repair costs only.  *See id.*  Travelers' January 7, 2019 letter reconfirming denial also wrongly maintained there was no covered cause of loss—not no damages under a covered loss.  *See* SF ▐ 76.

Had Travelers honored its Policy obligations and properly covered the Claim, then Travelers and the County would have addressed any disagreement regarding the scope of damage and a determination regarding replacement of the Garage in the ordinary course.  If Travelers paid only for limited repairs, the parties would be disputing the scope and amount of the loss, not coverage. But with this claim Travelers never asked the County to present its scope of damages or sent a proof of loss form.  *See* SF ▐▐ 74-75.

Travelers did not deny the County's claim on the basis of no damages.  Travelers denied the County's claim on the purported basis that there was no covered cause of loss under the Policy.  Accordingly, as a matter of law, Travelers should be estopped from challenging the reasonableness of the County's actions following Travelers' wrongful denial of coverage, as Travelers has waived any challenge to the reasonableness of the County's decision to demolish and replace the Garage and Toal and Sweney Buildings.

### D.      Replacement Cost of the Garage is at Least $18,239,180.15

The County and Travelers have each retained experts to opine regarding the replacement cost of the structures at issue in this case.  Both parties' experts have rendered opinions that the

30

appropriate replacement cost is in excess of Eighteen Million Dollars ($18,000,000).  The County's expert Steven Burke rendered an opinion which calculates the replacement cost for the Garage as well as for the adjacent Toal and Sweney Buildings, which all were demolished as a result of the abrupt collapse of the spandrel.[9]  SF ⁋ 80.

Mr. Burke's opinion that an "in-kind" replacement of the Garage and Toal and Sweney Buildings would cost a total of $32,589,630.  SF ⁋ 81.  That amount includes the actual $3,111,754 the County incurred for the demolition of the Garage and Toal and Sweney Buildings.  *Id.*

Travelers' own cost estimating expert, Joshua Cropp, issued an opinion purporting to rebut Mr. Burke's report, asserting that an "as was" replacement cost of the Garage would be $18,239,180.15.  SF ⁋ 82.  To be sure, the County believes Mr. Cropp's limited opinions and methodology are flawed to the extent they fail to account for necessary cost increases and construction means and methods due to requirements such as the Americans With Disabilities Act and seismic codes.  *See* SF ⁋ 83.   Nonetheless, Mr. Cropp's report demonstrates that Travelers does not dispute that the cost to replace the Garage is no less than $18,239,180.15.

Therefore, there is no genuine issue of material fact that the cost to replace the Garage is at least $18,239,180.15.

## VI.     CONCLUSION

For the foregoing reasons, the County of Delaware should be granted summary judgment as follows:

---

[9]     The abrupt collapse of the spandrel did not directly physically damage the Toal and Sweney Buildings; rather, these buildings could not be occupied for their intended use and were required to be demolished along with the demolition of the Garage because of their proximity to the Garage.  The County's claim for damages in this case includes the costs associated with the demolition of the Toal and Sweney Buildings, which were also insured under the Policy.  The County does not seek summary judgment on this issue at this time.

31

1.      The abrupt collapse of the concrete spandrel beam is a Covered Cause of Loss under the Policy's Abrupt Collapse additional coverage.

2.      Travelers breached its obligations under the Policy by failing to properly investigate the loss and wrongfully denying the County's claim.  Judgment in favor of the County as to Count I (Declaratory Judgment) and Count II (Breach of Contract) is warranted.

3.      Because Travelers wrongfully denied the County's claim, Travelers is estopped from challenging the reasonableness of the County's determination that replacement of the Garage was necessary.

4.      The Policy provides coverage for the Garage on a replacement-cost basis, and the measure of replacement cost in this case is no less than $18,239,180.15.  Damages in excess of this amount shall be proven at trial.

Dated:  October 19, 2020                    **ANDERSON KILL P.C.**

                                            By:    /s/ Arthur R. Armstrong
                                                   Arthur R. Armstrong, Esq.
                                                   1760 Market Street, Suite 600
                                                   Philadelphia, PA  19103
                                                   Telephone:  (267) 216-2700
                                                   E-mail: aarmstrong@andersonkill.com

                                                   Allen R. Wolff, Esq.
                                                   Ethan W. Middlebrooks, Esq.
                                                   1251 Avenue of the Americas
                                                   New York, NY  10020
                                                   Telephone:   (212) 278-1000
                                                   Facsimile:    (212) 278-1733
                                                   E-mail: awolff@andersonkill.com
                                                   E-mail: emiddlebrooks@andersonkill.com

                                                   *Attorneys for Plaintiff County of Delaware*