IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COUNTY OF DELAWARE | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 19-2430-JMY |
| TRAVELERS PROPERTY | : | |
| AND CASUALTY COMPANY | : | |
| OF AMERICA | : | |

**MEMORANDUM**

**YOUNGE, J.**  September 9, 2021

**I.   INTRODUCTION**

This is an insurance coverage and bad faith action by the County of Delaware, Pennsylvania (the "County") against its property insurer, Travelers Property and Casualty Insurance Company of America ("Travelers"). The County seeks coverage from Travelers for damages allegedly caused when, on July 27, 2018, a precast, concrete spandrel beam fell from the top-level roof to the top-level parking deck of a municipal parking garage at 201 West Front Street, Media, Pennsylvania (the "Garage"). The County contends that the damages it seeks—including the costs to demolish and replace the Garage and adjacent Toal and Sweeney Buildings—are covered under the Abrupt Collapse provision of its Travelers policy. Travelers, in contrast, contends that the Abrupt Collapse provision does not apply to any of the alleged damages, all of which, it claims, are also barred by policy exclusions. Travelers alternatively argues that to the extent any coverage is found to exist, it must be limited to damages in the impact area that were directly caused by the concrete beam's fall.

Presently before the Court are Travelers' Motion for Summary Judgment ("Trav. MSJ," ECF No. 60) as to all the County's claims, and the County's Motion for Partial Summary ("Cty MSJ," ECF No. 61) seeking judgment: (1) that the "abrupt collapse" of the beam is covered

under the Travelers policy; (2) judgment in the County's favor as to its claims for declaratory judgment and breach of contract; (3) that Travelers is estopped from challenging the reasonableness of the County's decision to replace the Garage; and (4) that the County is entitled to replacement cost coverage for the Garage in an amount no less than $18,239,180.15.

For the following reasons, summary judgment will be granted in favor of Travelers, and the County's Partial Motion for Summary Judgment will be denied.

## II.     BACKGROUND

### A.     Factual Background[1]

#### 1.     The Garage and Adjacent Buildings

The County owned and operated the Garage, which was used for employee and juror parking. (Cty. SMF ¶ 1, ECF No. 61-1.) The Garage was built in the early 1970s and was adjacent to and constructed around two preexisting County municipal buildings, commonly known as the Toal and Sweeney buildings. (Trav. SMF ¶ 3, ECF No. 60-2.) The Garage was a pre-cast concrete structure, with pre-cast concrete elements such as columns, girders, spandrels, and double-tee pre-stressed beams. (Cty. SMF ¶ 2.) It consisted of four levels and approximately 175,000 square feet and had 409 parking spaces. (Trav. SMF ¶ 4.)

#### 2.     Relevant Insurance Policy Provisions

Travelers issued to the County a Deluxe Property insurance policy, with policy number 630-1H967220-TIL-18, for the policy period June 26, 2018 through June 1, 2019 (the "Policy"). (Policy at TRAVELERS-000378, Middlebrooks Dec., Ex. A, ECF No. 60-4.) The Policy's limit

---

[1] The factual background is derived from the parties' statements of undisputed material facts ("SMF") and other summary judgment submissions, including the exhibits attached thereto. Unless otherwise indicated, the factual background is undisputed. With the exception of the insurance Policy at issue, the record is cited to herein by the alphabetical exhibit reference, followed by the CM/ECF pagination page number(s). Citations to the Policy are to the Travelers Bates numbers stamped at the bottom of each page.

of insurance for the County's buildings and business personal property is $435,448,433. (*Id*. at TRAVELERS-000401.)

The Policy Coverage Form states:

> **A.   COVERAGE**
> We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

(*Id.* at TRAVELERS-00412.) The Policy defines "Covered Property" as, among other things, "Buildings." (Cty. SMF ¶ 9; Trav. SMF Resp. ¶ 9, ECF No. 66; Policy at TRAVELERS-00412.) "Buildings," in turn, are defined as "the designated building or structure at the premises described in the Declarations." (Policy at TRAVELERS-000412.) The "Locations" on the Policy Declarations references the "Schedule of Locations and Buildings." (Policy at TRAVELERS-000378, 000383.) The Garage is designated on the Schedule of Locations and Buildings as Location No. 1, Building Nos. 9 and 10. The Sweeney and Toal Buildings are designated as Location No. 1, Building Nos. 7 and 8, respectively. (*Id.* at TRAVELERS-000383.)

The Policy defines Covered Causes of Loss as:

> **B.   COVERED CAUSES OF LOSS**
> Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
> 1.   Excluded in Section C., Exclusions
> 2.   Limited in Section D., Limitations; or
> 3.   Excluded or limited in the Declarations or by endorsement.

(*Id*. at TRAVELERS-000429.)

The Policy at the Section C., Exclusions, includes the following exclusions for Collapse and certain Other Types of Losses:

**C.   EXCLUSIONS**

\* \* \*

2. We will not pay for loss or damage caused by or resulting from any of the following:

\* \* \*

    **a.   Collapse**

        (1)   Collapse, including any of the following conditions of property or any portion of the property:

            (a)   An abrupt falling down or caving in;

            (b)   Loss of structural integrity, including separation of portions of the property in danger of falling down or caving in; or

            (c)   Any cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion as such condition relates to Paragraphs (a) or (b) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

        (2)   This Exclusion does not apply:

            (a)   To an abrupt collapse to the extent that coverage is provided under the Abrupt Collapse Additional Coverage in (3) below[.]

\* \* \*

    **i.   Other Types of Losses**

        (1)   Wear and tear;

        (2)   Rust, or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

\* \* \*

(*Id*. at TRAVELERS 000429, 000432-00435.)

The Collapse exclusion includes an exception providing for Abrupt Collapse Additional Coverage, which states, in relevant part:

  (3)  Abrupt Collapse Additional Coverage

The term Covered Cause of Loss includes abrupt collapse as described and limited under Paragraphs (a) through (g) below.

  (a)  As used in this Additional Coverage, abrupt collapse means abrupt falling down or caving in of a building or any portion of a building with the result that the building or portion of the building cannot be occupied for its intended purpose.

  (b)  We will pay for direct physical loss of or damage to Covered Property, caused by abrupt collapse of a building or any portion of a building that is insured under this Coverage Form, or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

    (i)  Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

      * * *

  (c)  Abrupt Collapse under Paragraphs (3)(a) and (b) above does not apply to:

    (i)  A building or any portion of a building that is in danger of falling down or caving in;

    (ii)  A portion of a building that is standing, even if it has separated from another portion of the building;

    (iii)  A building that is standing or any portion of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

(*Id*. at TRAVELERS 000433-000434.)

      3.    *The July 27, 2018 Incident*

In the early morning hours of July 27, 2018, an 8-inch thick, 4-foot-6-inch high, 48-foot long precast concrete spandrel beam fell from the north end of the top-level Garage roof onto the top-level parking deck (the "Incident"). (Cty. SMF ¶ 24, Trav. SMF ¶ 46.) Later the same day, Joseph Barbato of Joseph Barbato Associates ("JBA"), an outside consulting structural engineer for the County, conducted a site visit at the Garage, during which he reviewed the area of the fallen beam and then reviewed "the remainder of the structure to assess the potential for further collapse." (7/30/18 JBA Rept. at 2, Middlebrooks Dec. Ex. L, ECF No. 61-15.) Barbato documented his findings in a letter Report dated July 30, 2018, addressed to County officials, Thomas N. Micozzie and Jack A. Bierling Jr. (Cty. SMF ¶ 30; 7/30/18 JBA Rept.)

The July 30, 2018 JBA Report did not opine as to cause of the Incident, but observed:

> Based on our site review, it appears that the spandrel was connected to the supporting pre-cast concrete girders via steel weld plates cast into the concrete and connected on site during the original construction with three welds at each girder. We observed that these welds had sheared allowing the spandrel to fall to the main roof deck below (refer to Photos 5 and 6).

(JBA 7/30/18 Rept. at 5.) The Report further reflects that in the "immediate area of the collapse," Barbato reviewed the "welds connecting the spandrel on the south end of the high roof to the supporting girders" and the "steel plates and welds connecting the south spandrel to the sides of the supporting girders," but was unable during the site visit to review and verify the condition of the connections between the spandrels on the east and west sides of the high roof and the supporting double-T elements." (*Id.* at 6.) However, the Report states that "[w]e observed out-of-line and out-of-plumb conditions of the spandrels at the east and west sides of the high roof which indicate movement of these elements has occurred." (*Id.*) The Report also includes the following observations about the condition of the overall Garage:

6

- The majority of the lateral connections between the main roof spandrel beams and supporting columns are displaying evidence of failure, movement and/or corrosion. . . . The failure of this type of connection warranted the removal of the spandrel beam at the northwest corner of the garage in August 2013.

- The majority of the connections between the tops of the second and first floor spandrel beams and the supporting columns have failed. . . . The failure of these connections significantly compromises the stability of the structure and may contribute to progressive collapse of the garage.

- Out of plumb conditions were observed at roof and floor spandrel beams. In addition, we observed separations within existing sealant joints between spandrel beams and columns. These conditions suggest that the spandrel beams have moved with respect to the supporting structure and that the potential exists for these elements to move further and cause a collapse.

- Significant deterioration of the pre-cast concrete double-T's, spandrels, girders and columns is present.

(7/30/18 JBA Rept. at 6-9.) The Report's conclusion recommends immediate closure of the Garage, "[g]iven the history of collapse of significant pieces of the garage as well as the deteriorated conditions noted above." (*Id.* at 10.)

Subsequent reports by other experts generally agree that the Incident was caused by the failure of welds that were deficient when originally installed and then experienced long-term deterioration or decay. (*See* 8/5/18 Rept. of Harald Greve, P.E., SECB ("Greve"), Trav. SMF Ex. H, ECF No. 60-11 at 31-32; 6/12/20 Greve Rept., Trav. SMF Ex. I, ECF No. 60-12 at 7, 9, 15; 11/5/18 Rept. of Jeremy Urban, P.E. ("Urban"), Cty. SMF Ex. O, ECF No. 61-18 at 3-4; 9/11/20 Urban Rept., Cty. SMF Ex. N, ECF No. 61-17 at 3-6.) The County began demolition of the Garage and Toal and Sweeney Buildings in September 2018, and demolition was completed by March 2019. (Cty. SMF ¶ 33; Trav. SMF Resp. ¶ 33.)

The County provided notice of its claim to Travelers on the date of the Incident. (Cty. SMF Resp. ¶ 65, ECF No. 67-1.) On July 27, 2018, Travelers issued a reservation of rights letter

stating, *inter alia*, that "[a]t this time the Travelers Property Casualty Company Of America has been unable to determine whether your claim is covered under your policy based on the information currently available to us." (7/27/18 Trav. ROR Ltr., Trav. SMF Ex. H at 26; *see also* Cty. SMF Resp. ¶ 66.)  Subsequently, from August through September 2018, Travelers obtained reports from its engineering expert Harald Greve and repair estimates for the damage caused by the Incident from its building consultant JS Held, and it communicated with and requested documents and information from the County.  (*Id.* ¶¶ 67-75.)  On October 30, 2018, Travelers issued a denial letter referring, *inter alia*, to the Policy Collapse exclusion, Abrupt Collapse Additional Coverage provision, and the Other Types of Losses exclusion.  (Trav. SMF Ex. H at 51-54; *see also* Trav. SMF ¶¶ 76-78; Cty. SMF Resp. ¶ 76-78.)  After the County requested reconsideration of the denial, Travelers issued a letter dated January 7, 2019, reaffirming its coverage position.  (Trav. Ex. H at 55-58, 74-79; *see also* Cty. SMF Resp. ¶¶ 80-81; Trav. SMF ¶¶ 80-81.)

        4.      *Previous Garage Structural Issues and Inspections*

On August 9, 2013, an apparent structural problem was observed with a spandrel beam at the top deck of the Garage.  (8/21/13 JBA Rept., Trav. SMF Ex. B, ECF No. 60-5 at 38-42.)  JBA, retained by the County to inspect the beam, determined that the "weld plate connections had failed and had separated by 2-3 inches eliminating the lateral support for the beam," and that "the beam was in such a fragile state that collapse was imminent." (*Id.* at 39.)  JBA further observed that "[t]he spandrel beam was tilting outward and unacceptable amount and we deemed this situation dangerous requiring immediate action." (*Id.*)

JBA subsequently conducted a visual review of existing structural elements at all levels of the Garage over four days in August and September 2013.  (10/3/13 JBA Rept., Trav. SMF Ex. B at 43-55.)  The structural elements JBA reviewed included "pre-cast double tees, precast

8

spandrel beams and girders, pre-cast and cast-in-place columns, cast-in-place walls, and concrete masonry unit (CMU) and brick walls." (*Id.* at 43.) JBA summarized its findings in a "Preliminary Structural Engineering Condition Evaluation," dated October 3, 2013 and addressed to Dennis J. Carey, P.E., the County Director of Public Works. (*Id.*) In the Observations section, the October 13, 2013 Report noted:

> During our survey of the parking garage we observed many deficiencies, which included spalled concrete, exposed reinforcing bars, exposed wire pre-stress strands, cracks in concrete, out-of-plumb spandrel beams, broken welds, detached steel weld plates, deteriorated steel connections, cracks in the brick masonry, and displaced brick masonry.

(*Id.*; *see also* 5/13/20 Barbato Dep., Trav. SMF Ex. B at 11 (stating that the Report Observations "referr[ed] to the entire Garage").)

The October 13, 2013 Report identified "Safety and Stability" conditions and deficiencies and identified items that "should be addressed immediately," including "spandrel beams out of plumb or with sweep—roof and second floor levels," "broken welds at end connections of exterior spandrel beams – roof and second floor," "detached steel weld plates," and "deteriorated steel connections at ends of beam." (*Id.* at 44-49.) The Report further identified conditions and deficiencies in the "Structural Repairs" category that "should be addressed to maintain/restore the condition of the structure and prevent further structural deterioration," recommending that a repair program begin within a year. (*Id.* at 49-53.) The conditions and deficiencies in the Structural Repairs category included "exposed steel reinforcement and pre-stress strands," "exposed wire strands in precast tee web," "cracks in concrete," "deteriorated steel-corroding and deteriorated steel." (*Id.*) The Report advised that "[i]f left unattended, these conditions would continue to deteriorate affecting the structural integrity of the elements and posing a threat to the safety of the people using the garage." (*Id.* at 49.) When asked at his subsequent

9

deposition whether he had observed deteriorated steel throughout all levels of Garage in 2013, Barbato responded "yes." (5/13/20 Barbato Dep., Trav. SMF Ex. B at 11.)

On November 1, 2013, Barbato prepared a letter to County Public Works Director Carey titled "Structural Engineering Services" for the "Delaware County Orange Street Parking Garage Assessment." (11/1/13 JBA Ltr., Trav. SMF Ex. B at 56-57.) The letter included the following statements:

> [A]s a result of the hazardous structural condition with the spandrel beam at the top deck of the garage (along Amber Street) discovered in August this past summer our firm was requested to perform a condition inspection of the remainder of the garage. Since the August incident we have been on site numerous times to observe and record the condition of the garage structural elements. During our survey we observed many deficiencies, which included spalled concrete, exposed reinforcing bars, exposed wire pre-stress strands, cracks in the concrete, out-of-plumb spandrel beams, broken welds, detached steel weld plates, deteriorated steel connections, cracks in the brick masonry, and displaced brick masonry. Based on our observations of the condition of the garage is considered poor and in need of extensive repairs – both immediate and near future.

(*Id*. at 56.)

On February 28, 2014, JBA issued the "Delaware County Orange Street Parking Garage Assessment," addressed to Public Works Director Carey. (2/28/14 JBA Assessment, Trav. SMF Ex. B at 61-97.) The Assessment noted JBA's conclusion that "the garage is in below average condition and in need of significant restoration." (*Id.* at 63.) JBA further noted deteriorated connections between spandrel beams and columns at the roof level of the Garage, "[c]racks and spalls in the portion of the pre-cast concrete girders that support pre-cast double T beams" existing "at all levels," and that the "existing exposed steel connection plates at girders and columns have corroded at all levels." (*Id.* at 74, 84.) Appended to the Assessment are photographs showing the conditions observed by JBA. (*Id.* at 72-86.) In 2016, the County retained Joseph Jingoli and Son, Inc. to perform planning and pre-design services related to the

demolition and replacement of the parking garage and adjacent building, and brought in an architect and garage consultant. (Trav. SMF ¶ 35; Cty. SMF Resp. ¶ 35.)

Less than four months before the Incident, Barbato prepared a Presentation, dated March 14, 2018, for the County Council. (3/14/18 JBA Presentation, Trav. SMF Ex. B at 98-203.) In the Presentation, Barbato summarized his observations as follows:

- Based on our observations, the condition of the garage is considered poor and has well outlived the expected design life. Original construction date is 1973.

- Typical design life of garage structures of this type would be approximately 30 years.

- Both immediate and near future funding is required to ensure the safety of the structure. It is our opinion that sections of the garage will need to be shuttered.

- During our survey of the parking garage we have observed many deficiencies including spalled concrete, exposed reinforcing bars, exposed wire pre-stress strands, cracks in concrete, outof-plumb spandrel beams, broken welds, detached steel weld plates, deteriorated steel connections, cracks in the brick masonry and displaced brick masonry.

- These deficiencies impact the structural integrity and stability of the structure resulting in safety concerns.

(*Id.* at 98.) When Barbato was later asked at his deposition if anything in particular in the above-noted deficiencies had him concerned about the Garage structural integrity and stability, he responded "all of them." (5/13/20 Barbato Dep., Trav. SMF Ex. B at 30.)

**B.   Procedural History**

The County filed its Complaint against Travelers on May 1, 2019, in the Delaware County Court of Common Pleas. (Compl., Not. of Removal. Ex. 1, ECF No. 1-1.) The County asserts the following claims against Travelers: Declaratory Judgment (Count I), Breach of Contract (Count II), Statutory Bad Faith (Count III), and Breach of Implied Covenant of Good

11

Faith and Fair Dealing (Count IV). (Compl.) On June 4, 2019, Travelers removed the action to this Court, and on June 20, 2019, filed its initial Answer with Affirmative Defenses.[2] (Answ., ECF No. 7.) The parties conducted extensive discovery, necessitating several extensions of case management deadlines and informal resolution of motions to compel. (*See* ECF Nos. 25, 27, 30, 35, 47, 48, 52). Travelers and the County filed their respective Motions for Summary Judgment and for Partial Summary Judgment on October 19, 2020. (ECF Nos. 60, 61.) On November 19, 2020, the parties filed their Responses to those Motions (Trav. Opp., ECF No. 66; Cty. Opp., ECF No. 67), and they each filed a Reply on December 1, 2020.[3] (Cty. Reply, ECF No. 71; Trav. Reply, ECF No. 72.)

**III.     LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making this determination, we must weigh all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). "For its part, '[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials [in] his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Id*. at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist*., 765 F.3d 260, 268-69 (3d Cir. 2014)).

---

[2] Travelers was subsequently twice granted leave to amend its Answer and Affirmative Offenses. (ECF Nos. 31, 22, 55, 62.)

[3] The parties' summary judgment submissions, including exhibits, total more than 2,900 pages.

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*. at 289 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  "Conversely, 'where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.'" *Goldenstein v. Repossessors Inc*., 815 F.3d 142, 146 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist*., 767 F.3d 247, 265 (3d Cir. 2014)).  "The same standards and burdens apply on cross-motions for summary judgment." *Allah v. Ricci*, 532 F. App'x 48, 50 (3d Cir. 2013) (citing Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987) ).

## IV.  DISCUSSION

### A.  Insurance Policy Construction Principles and Burdens of Proof

It is undisputed that Pennsylvania law governs the interpretation and construction of the Policy.  Under Pennsylvania law, courts interpreting insurance policies "are guided by the polestar principle that insurance policies are contracts between an insurer and a policyholder." *Kurach v. Truck Ins. Exch*., 235 A.3d 1106, 1116 (2020).  We thus "apply traditional principles of contract interpretation in ascertaining the meaning of the terms used therein." *Id*.  If the policy terms are clear and unambiguous, we must give effect to the plain and ordinary meaning of those terms.  *See Kurach*, 235 A.3d at 1116.  If, however, an ambiguity is identified in the policy, we must construe it in favor of the policyholder.  *Id*.  Insurance provisions are considered ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id*. (quoting *Madison Constr. Co. v. Harleysville Mut. Ins*., 735 A.2d 100, 106 (1999)).  "[T]he lack of a definition for an operative term," however, "does not

necessarily render the policy ambiguous." *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 847–48 (Pa. Super. Ct. 2020).

"In Pennsylvania, the insured has the burden 'to establish coverage under an insurance policy.'" *Easy Corner, Inc. v. State Nat'l Ins. Co.*, 154 F. Supp. 3d 151, 154 (E.D. Pa. 2016) (quoting *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206 (3d Cir. 2001).) Then, "[if] the dispute involves an exclusion in the insurance policy, 'the burden is upon the insured to show that a loss has occurred; thereafter, the burden is on the insurer to defend by showing that the loss falls within a specific policy exclusion.'" *United Nat'l Ins. Co. v. Indian Harbor Ins. Co.*, 160 F. Supp. 3d 828, 839 (E.D. Pa. 2016) (quoting *Wexler Knitting Mills v. Atl. Mut. Ins. Co.*, 555 A.2d 903, 905 (Pa. Super Ct. 1989)). The Third Circuit Court of Appeals, interpreting Pennsylvania law, has recognized that "'there is a subset of exclusion cases that concerns exceptions to exclusions." *Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co.*, 25 F.3d 177, 180 (3d Cir. 1994). In these cases, "[t]he burden is on the insured, not the insurer, to introduce evidence to show that the exclusion which appears to be triggered does not apply after all." *United Nat'l Ins. Co. v. Indian Harbor Ins. Co.*, 160 F. Supp. 3d 828, 839 (E.D. Pa. 2016) (quoting *Air Prods. & Chems.*, 25 F.3d at 180)). In other words, once an insurer shows that an exclusion applies, the insured bears the burden of proving that an exception to the exclusion applies. *See, e.g., Jugan v. Econ. Premier Assurance Co.*, 728 F. App'x 86, 90 (3d Cir. 2018) ("If the insurer demonstrates that an exclusion applies, the burden shifts back to the insured to prove an exception to the exclusion."); *Consol. Rail Corp. v. ACE Prop. & Cas. Ins. Co.*, 182 A.3d 1011, 1027 (Pa. Super. Ct. 2018) ("[I]f the policy contains an exception to an exclusion, the burden to prove whether the exception applies falls again on the insured."); *TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 915 (Pa. Commw. Ct. 2004) (construing a directors' and officers'

14

liability insurance policy and holding that as the insurer "met its burden in establishing the applicability of the exclusion, the [insureds] bear the burden of establishing the applicability of any exception to this exclusion").

The County contends that it does not bear the burden of showing the applicability of the Abrupt Collapse Additional Coverage and argues that the Policy general exclusions do not apply to this provision. (Cty. MSJ Mem., ECF No. 61-1 at 18-21.) According to the County, the Abrupt Collapse Additional Coverage is "not [] an exception to an exclusion but rather [] an additional coverage. (*Id.* at 19 (emphasis in original).) The Court disagrees. First, the Abrupt Collapse exception is not contained in a Coverage provision of the Policy; rather, as noted above, it is contained within the exclusion for Collapse. Second, it is the insured's burden to establish that its claim is within the coverage of an insurance policy. *See, e.g.*, *Easy Corner, Inc. v. State Nat'l Ins. Co.*, 154 F. Supp. 3d at 154. Thus, the County's effort to categorize the Abrupt Collapse provision as a coverage grant is illogical, as the County still has the burden of showing that its claim is covered under that provision, which it has failed to do. Third, the cases the County cites for this argument are inapposite and are undermined by the authority noted above. Both *Bishops, Inc. v. Penn Nat'l Ins.*, 984 A.2d 982, 992 (Pa. Super. Ct. 2009), and *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1251 (Pa. Super. Ct. 2008), involved insureds who had purchased an amendatory endorsement that specifically overrode a policy exclusion, not, as here, an exception contained within an exclusion. *See S.R.P. Mgmt. Corp. v. Seneca Ins. Co.*, No. 06-935, 2008 WL 2039466, at *3, 6-7 (E.D. Pa. May 13, 2008) (noting that insured had burden of establishing applicability of exception to collapse exclusion); *S.O. Beach Corp. v. Great Am. Ins. Co. of New York*, 305 F. Supp. 3d 1359, 1364 (S.D. Fla. 2018) (same), *aff'd*, 791 F. App'x 106 (11th Cir. 2019); *PMW Real Est. Mgmt., LLC v. State Farm Fire & Cas. Co.*, No. 11-1395, 2013 WL

3993759, at *2, 5 (W.D. Pa. Aug. 5, 2013) (same); *Young Sook Pak v. Alea London Ltd.*, No. 08-0824, 2009 WL 2366549, at *3, 7 (M.D. Pa. July 30, 2009) (same); *Wurst v. State Farm Fire & Cas. Co.*, 431 F. Supp. 2d 501, 504 (D.N.J. 2006) (same).  Finally, even if Travelers bore the burden of establishing the inapplicability of the exception at issue, we would find based on the undisputed facts detailed above and the authority discussed below that Travelers has satisfied that burden.

Travelers has asserted that the Coverage exclusion bars the County's claim, and the County has not argued that this exclusion would not otherwise apply but for the Abrupt Collapse Additional Coverage provision.  Instead, the County's claim for coverage of the Incident relies on the Abrupt Collapse exception to the exclusion, and it thus bears the burden of establishing that the exception applies.  Specifically, to defeat summary judgment, the County must establish that genuine issues of fact exist regarding (1) whether the Garage decay was "hidden from view"; and if it was hidden, (2) whether the decay was "known to [the County] prior to the collapse.

**B.      The Decay Was Not "Hidden From View" and Was Known to the County**

Travelers argues that based on the undisputed facts and record evidence, the County cannot support its contention that the decay of the Garage was hidden from view **and** unknown to the County, and no reasonable jury could find in the County's favor on these issues.   The Court agrees.

As a threshold matter, we note that collapses *not* caused by *hidden* decay are excluded from coverage under the Policy.  *Wurst*, 431 F. Supp. 2d at 506.  Accordingly, if the Incident was caused by "[r]ust, or other corrosion, decay, [or] deterioration" that was not hidden, coverage would be precluded by the Policy exclusion for "Other Types of Losses," which does not contain any exceptions.  *See id.*  As detailed above, the undisputed record establishes that decay

consisting of corrosion and deterioration was not only visible throughout the Garage, it was known to the County since at least 2013.

We next turn to the meanings of "decay" and "hidden," which are not defined in the Policy.  In such a case, "[w]ords of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions." *Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. Ct. 2007); *see also Madison Constr. Co.*, 735 A.2d at 108.  However, such terms must "be read in light of the context and the overall provisions of the policy in which [they] appear[ ]." *Jennings v. Hartford Fire Ins. Co.*, No. 90-3125, 1991 WL 68019, at *3 (E.D. Pa. Apr. 25, 1991) (citing *Luko v. Lloyd's of London*, 573 A.2d 1139, 1142 (1990)).

Applying these principles, and despite Travelers' unwillingness to concede that rust, corrosion, and deterioration constitute decay, we interpret decay to include these conditions. *See PMW Real Estate Mgmt.*, 2013 WL 3993759, at *5 ("'[D]ecay' means 'decomposition,' 'a process of wasting away,' 'a decline in quality.'" (quoting THE OXFORD DICTIONARY AND THESAURUS (American ed. 1996)); *Norfolk & Dedham Mut. Fire Ins. Co. v. DeMarta*, 799 F. Supp. 33, 35 (E.D. Pa. 1992) ("The definition of 'decay' as it pertains to material things is: 'Wasting or wearing away, disintegration; dilapidation, ruinous condition.'" (quoting IV Oxford English Dictionary, 322 (Clarendon Press, 2d Ed.1989)), *aff'd*, 993 F.2d 225 (3d Cir. 1993). Accordingly, we are satisfied that decay for purposes of the Abrupt Collapse provision includes deterioration and corrosion.

The County's coverage claim, however, fails with respect to requirements that the decay be "hidden" and "not known to the insured."  "Courts construing the term 'hidden decay' have interpreted it to mean decay that is 'not visible,' 'out of sight or off the beaten track; concealed,'

17

'out of sight," or 'concealed.'" *PMW Real Est. Mgmt.*, 2013 WL 3993759, at *5 (citing *S.R.P. Mgmt. Corp.*, 2008 WL 2039466, at *7 (collecting cases)); *see also Wurst*, 431 F. Supp. 2d at 505 (ruling that insured's testimony was insufficient to support claim that decay was hidden).

Moreover, the County cannot meet its burden by simply asserting that it was unaware of the decay at the specific location of the Incident, where it had been repeatedly informed for years by its structural engineering consultant that the same kinds of decay existed throughout the Garage. *See Fry v. Phoenix Ins. Co.,* 54 F. Supp. 3d 354, 367 (E.D. Pa. 2014) (holding that coverage for collapse caused by deterioration known the insureds was barred by the policy and the fortuity doctrine and collecting cases regarding fortuity doctrine); *S.R.P. Mgmt. Corp.*, 2008 WL 2039466, at *8. The test is objective—whether a reasonable insured under the same circumstances would have seen or otherwise been aware of the decay. *Id*.

"While an insured need not affirmatively inspect the insured premises so as to uncover otherwise hidden decay and repair it before it worsens, he likewise cannot retreat to willful blindness or refusal to draw those conclusions a reasonable insured would draw from visible signs of deterioration or decay." *S.R.P. Mgmt. Corp.*, 2008 WL 2039466, at *8 (citations omitted); *see also S.O. Beach Corp.*, 305 F. Supp. 3d at 1367 ("Courts hold that insureds with knowledge of pre-existing deterioration cannot recover for damage caused by the worsening of that deterioration."); *Sandalwood Condo. Ass'n at Wildwood, Inc. v. Allstate Ins. Co*., 294 F. Supp. 2d 1315, 1319 (M.D. Fla. 2003) ("[I]n order to recover under the policy, [the insured] must demonstrate that the damage to the structural integrity of the [property] was not visible and that [the insured] neither knew nor should have known of the structural damage with sufficient time to allow for repairs before it reached the stage of 'collapse.'"); *Andrew-Riverside Presbyterian Church v. Guide One Mut. Ins. Co*., No. A04-1533, 2005 WL 949183, at *4 (Minn.

Ct. App. Apr. 26, 2005) (observing that the record was replete with evidence that the deteriorating condition of the property was visible and known to the insured); J*udge v. State Farm Ins. Cos*., No. 92-C-03-010, 1993 WL 1611307, at *3 (Del. Super. May 3, 1993) ("It is reasonable to attach the responsibility of being aware of the conditions of one's home to those areas where the damage is clearly preventable through reasonable and routine maintenance or where the homeowner should be aware of the problem."). As the Court in *S.R.P.* observed, "[i]n the absence of a reasonable insured objective test, the 'hidden decay' exception could well swallow the 'collapse' exclusion." *S.R.P. Mgmt. Corp*. 2008 WL 2039466, at *8 n.9

In this case, the undisputed evidence detailed in the factual background (and depicted in exhibit photographs) overwhelmingly establishes that decay was visible throughout the Garage and well known to the County since no later than 2013. Thus, the collapse does not fall within the Abrupt Collapse Additional Coverage exception to the Collapse exclusion, and the County's claim is therefore excluded. For same reasons, Travelers properly denied coverage, and all of the County's claims against Travelers will be dismissed.

V.     **CONCLUSION**

For the foregoing reasons, Travelers' Motion for Summary Judgment will be granted, and the County's Motion for Partial Summary Judgment will be denied in its entirety. An appropriate order follows.

                                         **BY THE COURT:**

                                        /s/ John Milton Younge
                                       **JUDGE JOHN MILTON YOUNGE**